238 S.W.2d 849 (1951)
VOGELGESANG
v.
WAELDER et al.
No. 28096.
St. Louis Court of Appeals, Missouri.
April 17, 1951.
Rehearing Denied May 18, 1951.
*850 Fuller, Fuller & Ely, and Carstarphen & Harvey, all of Hannibal, for appellants.
Roy Hamlin and Rendlen & Rendlen, all of Hannibal, for respondent.
HOUSER, Commissioner.
This is a suit for personal injuries and property damage arising out of a collision between two automobiles on July 4, 1949 on State Highway 56 in Marion County, Missouri, at a point approximately one mile north of its junction with U. S. Highway 61. The plaintiff Barbara Vogelgesang sued Eugene Waelder, the owner, and Jack Waelder, the driver, of the vehicle with which her car collided, and each of the defendants filed separate answers and counterclaims, the father, Eugene, counterclaiming for the damages to his car and the son, Jack, counterclaiming for personal injuries.
Tried to a jury the issues were found for the plaintiff and against both defendants on her petition and she was allowed $2,500 for personal injuries and $750 for property damage. The issues on the counterclaims were found against the defendants and for the plaintiff.
Defendant Eugene Waelder filed a motion for a new trial or in the alternative for a judgment notwithstanding verdict. Defendant Jack Waelder filed a motion for a new trial. Both motions were overruled and both defendants appealed.
*851 Highway 56 runs north and south at the place of the collision, and consists of a blacktop pavement 20 feet wide, with narrow shoulders on each side. There was a row of gravel and blacktop material extending north and south of the point of impact a considerable distance. It was a foot or a foot and one-half high, and two feet wide, its west edge extending 4 or 5 feet west of the east edge of the highway, so that there were 3 feet of highway east and 15 feet of highway west of the material. The weather was warm, the pavement dry and the visibility good. Plaintiff was driving her Chevrolet north and the Plymouth car belonging to defendant Eugene Waelder was coming south at the time of the collision, which occurred on the east side of the highway.
Plaintiff testified that she and one Ruba Stephens were traveling north on the east side of the blacktop, her right wheels approximately 6 inches from the row of gravel. As she proceeded up an elevation at a speed of 30-35 miles per hour, looking north, approaching the top of the hill, approximately "one block" from the top of the hill, she saw a car coming over the hill from the north traveling south directly in her path, and on her side of the highway. She could not see the car for more than 240-300 feet because the hill "was in the way." As it came toward her "he shimmied a little bit, then he came over to the other side * * * my left * * * the west side * * * then it turned and came over to my side again, to the east side * * * and hit my car." She testified that she did not know "how many feet away he was when he went to the west but it was less than a block." When she saw the other car approaching she applied her brakes "immediately that I saw him which was about a block away as much as I can judge," and headed for the ditch on the east side, that he ran into her, striking the left front portion of plaintiff's car, throwing plaintiff's car around until it was facing south, where it came to a rest headed in the direction from which she had come. The Waelder car landed in the east ditch "and then fell backward" with the front end down in the ditch and the back end "laying across the (left) door of my car." Plaintiff's car did not turn over. Plaintiff stated "Without doubt my wheels must have gone through that gravel," but she did not know how far. She pulled to the right before the impact. There were marks on the entire front end and on the left side of plaintiff's car.
Ruba Stephens testified that "the car was coming over the hill at least in the center if not across the center line, if there had been a center line there, and as it came the front wheels shimmied. He went to his right and then came directly toward us * * * the two cars met;" that immediately before the impact the Vogelgesang car was on the right-hand side of the road going north very close to the row of gravel; that when the Waelder car came over the hill it was closer to the east side than it was to the west.
With particular reference to the shimmying, Miss Stephens testified as follows:
"Q. Where did you see this Waelder car shimmying and for how long did it shimmy? A. I couldn't tell you for how long.
"Q. Were all four wheels shimmying? A. The front two.
"Q. How much of a shimmy would you say there was? A. What do you mean?
"Q. Was it shaking a great deal, or what? A. Yes, sir.
"Q. Was that before he turned to the right or after? A. Before.
"Q. Did you observe any shimmying after he had turned to the right? A. I don't recall any, no, sir.
"Q. Did you observe any shimmy in that car after he turned to the left, after having once turned to the right and then turned to the left, did you see any shimmying on the part of the 1941 Plymouth? A. No, sir.

******
"Q. Where was that with reference to the crown or peak of that hill, that you saw any shimmying on the part of the Plymouth? A. Just as he came over.
"Q. I thought you didn't see that car until Miss Vogelgesang applied the brakes?
*852 A. He was at the top of the hill when I saw him.
"Q. Was that prior to the application of the brakes? A. The application of the brakes was first.
"Q. And the Waelder car was still at the crown of the hill then, is that right, or just coming over the crown, is that right? A. Yes, sir.
"Q. And that is when you saw the shimmying? A. Yes, sir."
Harold Schroer, highway patrol trouper called to the stand by plaintiff, placed the collision .2 of a mile north of the junction of Highways 61 and 56. When he arrived at 6:35 p. m. both cars were on the east side of the road, plaintiff's Chevrolet turned around headed almost south, rear wheels astraddle the ridge of blacktop, the Plymouth headed possibly east, its rear touching the rear of the Chevrolet. The front of the Plymouth was in the ditch. Nearly all of the Chevrolet was on the road surface. There was a pronounced tire mark, a single skid mark which started 6 feet east of the west edge of the pavement beginning 69 feet north of the point of impact, extending in a line nearly parallel to the highway for a distance of about 23 feet, then veering slightly towards the east, then as it neared the vehicles, turning more sharply to the east and extending 12 feet beyond the point of impact. The witness testified that the following distances are required in which to stop a car traveling at these speeds:

 Feet Speed
 ____ _____
 40 20
 73 30
 115 40
 165 50

Defendant Jack Waelder, age 16, testified that he was driving the Waelder Plymouth south, accompanied by his girl friend, and another young couple, returning from a swimming party. All four of the occupants of the Waelder car testified that it was being driven on its right side of the road, traveling at speeds variously estimated at from 30 to 40 miles per hour. Jack testified that when he was at the top of the hill he saw the Vogelgesang car in the middle of the road, mostly on his side, 75 or 100 feet ahead of him; that when he first saw this car he slowed down; that he kept on his side, but the other car "just kept coming at me more and more, and so I swerved over to her side to get out of this car's way." He said he was "right up against the road shoulder" as far as he could get before he swerved to the left; that it appeared that the Vogelgesang car was going over to the ditch on Jack's side of the road; that when he first saw the Vogelgesang car he put his foot on the brake "right away * * * kind of medium"; that this action started to slow the movement of his car, and that he continued straight on his side of the road for about 25 feet, and then, when the cars were between 25 and 50 feet apart, seeing that she was coming straight at him, he "swerved over to the left side of the road." At that time he was traveling 20 or 25 miles per hour, and the Vogelgesang car was still on his side. After he cut over onto the left-hand side of the road "this other car cut back into" him, "turned more over to the east side again," and the cars collided when the Waelder car was "a foot away from the gravel pile." At that time Jack testified he was traveling 10 or 15 miles per hour. He testified that when he first saw plaintiff's car it was traveling 40 or 45 miles per hour; that plaintiff's car did not slow down at any time, and at the time of the impact was going about the same speed "if not faster" than when he first saw her.
The two girls testified that they felt the application of the brakes and the swerving of the Waelder car.
Dannie Hatton, an occupant of the Waelder car, testified that "As we came over the crest of the hill I saw this other car, it was banking off gradually from the east to the west to our side of the road * * * about the same speed that we were travelling * * * in the middle or 2/3 to the west side of the road"; that Jack "immediately of course applied his brakes * * * went to his right * * *," continuing in that direction "Oh, I guess about 100 feet or over * * *. He stayed on the right side and traveled for a while then he immediately cut over * * * he hit the *853 brakes and cut to his left" when the other car was about 40 feet away.
Plaintiff submitted her case to the jury on eight instructions, three of which directed verdicts.
P-1, after the preliminary recitals, directed a verdict against Jack Waelder upon a finding "that defendants' automobile was travelling at a high and unreasonable rate of speed, and without having said automobile under proper control at the time and place, drove said automobile to the left side of the center of the usable portion of said highway and into plaintiff's automobile, * * *."
P-2 was as follows:
"The Court instructs the jury that if you find and believe from the evidence that the collision mentioned in evidence and complained of, and the injuries to plaintiff, if any, were caused by the negligence, if any, of the defendant, Jack Waelder, in any one or more of the following particulars, to-wit:
"1In negligently operating and driving said Plymouth automobile at an unnecessary, fast, dangerous and negligent rate of speed, the time, place and circumstances considered.
"2In negligently failing, when operating and driving said Plymouth automobile at said time and place, to exercise the highest degree of care to keep said automobile as close to the right-hand side of the usable portion of the highway as practicable.
"3In negligently failing to have their said automobile under such control that it could readily and reasonably be stopped upon the appearance of danger.
"Then, if you so find, you will find the issues for the plaintiff against defendant Jack Waelder, providing you find and believe from the evidence that plaintiff was exercising the highest degree of care in the operation of her automobile."
P-3 directed a verdict against Eugene Waelder upon finding that Eugene had title to the automobile driven by his minor son Jack; that the automobile was not in adequate and proper repair and condition to be operated upon the highways due to the shimmying of the front wheels; that the front wheels were shimmying at the time and place of the collision; that Eugene Waelder knew or by the exercise of reasonable care could and should have known of such defective condition, yet consented or permitted the automobile, while in such defective condition, to be driven at the time and place in question by his son Jack, and that the collision "was directly and proximately produced by such shimmying of the front wheels of the Plymouth car, or such shimmying directly and proximately contributed in producing the collision * * *."
Other instructions given for plaintiff and attacked on this appeal will be referred to presently.
Appellants' first two complaints, that error was committed in failing to direct a verdict for Eugene Waelder and error in giving Instruction P-3, may be considered together. The gist of the contention is that there was no proof of agency of Jack for Eugene, and a failure to prove either that Eugene knew of the defective condition of the Plymouth, or that the defect caused the collision.
The evidence disclosed that title to the Plymouth was taken in the name of the father, Eugene, on June 15th; that Eugene had driven the car to work "a couple of times" but "didn't drive it too much"; that Jack drove the car when his father was not using it; that Jack drove it every day or two; that he used it to go to and from work, and that he would use it to drive around wherever it suited his pleasure.
On the day in question, according to Jack, he said nothing to his father about taking the car, or what he was going to dohe "just got in the car and took off"; his father did not know that he was not going to work that afternoon, did not know that he was going swimming,"didn't know nothing about it"; Eugene did not ask Jack to do anything for him that day with the automobile; Jack was not doing anything for his fatherwas not making a trip for his fatherthat afternoon.
Eugene testified that he knew Jack took the Plymouth to work on the morning of July 4, and knew that Jack had the car *854 in his possession at noontime when Jack took the two small daughters "to see the boat races", but did not know where Jack went that afternoon.
The only evidence in the record touching the question of Eugene's knowledge of the defective condition of the Plymouth was plaintiff's testimony that on the day after the collision, at Key's Garage, in the course of a conversation relating to the car, Eugene said: "There was a little shimmy in it."
The evidence is insufficient to submit to the jury any question of liability on the part of Eugene Waelder.
Certainly Jack was not Eugene's agent. He was not on any mission for or business of his father. All of the evidence shows that Jack was driving the car on a personal pleasure trip with his girl friend and two other young persons at the time of the collision. While it is inferable that Jack was using the car with the general permission and consent of his father, the latter did not even know that the son was out on a swimming expedition, but on the contrary thought he was at work. The fact that the certificate of title was in the name of Eugene, and that Jack had the general permission of his father to use the car, is wholly insufficient to establish the agency of the son for the father so as to impose liability upon the latter. Mount v. Naert, Mo.Sup., 253 S.W. 966; Mayes v. Fields, Mo.App., 217 S.W. 589; Mulanix v. Reeves, 233 Mo.App. 143, 112 S.W.2d 100.
The cases of Kaley v. Huntley, 333 Mo. 771, 63 S.W.2d 21, and Spellmeyer v. Theo. Hiertz Metal Co., Mo.App., 272 S.W. 1068, 1070, cited by respondent, provide no assistance under the facts. In the Kaley case there was substantial proof of the relationship of principal and agent between the father and daughter. The use of the car to transport the picnickers in that case was an enterprise taken over by the father. He accepted the guests in the car as his own. Instead of driving the car himself, he committed its operation to his daughter, retaining the right to control its movements, making his daughter in effect his chauffeur. He went along on the trip, and the circumstances strongly supported the theory of agency. In the Spellmeyer case, evidence that the defendant's truck caused the injury; that defendant did not question this fact; that the truck was being operated on the streets during the business hours of the day, under the control and charge of the chauffeur; that no attempt was made to show that the chauffeur was not in defendant's employ, or that he was engaged in some other business than that of defendant; and where defendant's counsel "practically committed the defendant to the fact that defendant's name was on the truck," was held sufficient evidence to warrant the inference that the master-servant relationship existed.
The facts in these cases are so materially different from those in the case at bar that they are not persuasive.
Nor was there sufficient evidence upon which to fix liability upon the father on the ground that his automobile was not in adequate and proper repair and condition to be operated upon the public highways due to the shimmying of the front wheels. True enough, there is a duty imposed by law upon the owner of an automobile to exercise ordinary care to see to it that when permitted by him to be operated upon the public highways the automobile is not so defective that such operation would thereby endanger the property and person of others, Standard Oil Co. of Indiana v. Leaverton, 239 Mo.App. 284, 192 S.W.2d. 681 (a bailment case in which a third party was injured); Spelky v. Kissel-Skiles Co., Mo.App., 54 S.W.2d 761 (a bailment case in which the bailee was injured); and this rule applies to injuries or damages inflicted upon a member of the public when the vehicle is operated by a gratuitous bailee and a defective condition causes or contributes to cause the casualty. Since an automobile is not per se a dangerous instrumentality, its owner does not owe an absolute duty as an insurer to keep his vehicle in a safe and proper condition for use on the public highways. He is only bound to exercise ordinary care to see that the automobile is in such condition. 170 A.L.R. 615.
*855 The following facts must be proved in order to fix this type of liability upon the owner of an automobile: (1) the ownership of the car; (2) the gratuitous bailment; (3) the existence of the defective condition at the time of the bailment; (4) knowledge by the owner at that time of the existence of the defective condition. See Bolin v. Corliss Co., 262 Mass. 115, 159 N.E. 612. This may be actual or constructive knowledge. If constructive knowledge is relied upon there must be proof either that the defect had existed for such a length of time that the owner in the exercise of ordinary diligence could or should have known of it, or that the defect was of such a nature that it would have been revealed by an ordinary inspection, and that such inspection was not made. (5) The connection between the defective condition and the injury or damage (proximate cause).
In the case at bar there was no proof of requirements 3 or 4. It was proved that the car wheels were "shimmying" at 5:30 p. m. July 4, 1949 immediately before the collision and that on the next morning the owner said "It had a little shimmy." From this evidence the jury cannot be permitted to infer either that the shimmy existed or that the owner knew of the existence of the shimmy at the time the permission was given his son to use the car. Such an inference would be pure guesswork. A "shimmy" in automobile wheels has its inception at a time certain, and for all we know from this record the condition may have developed for the first time on the trip on the afternoon of July 4. Eugene's statement on July 5 does not necessarily mean that he had personally observed the shimmy or knew thereof prior to the 4th of July. The knowledge may have been communicated to him by his son after the collision. It was not shown that the defective condition existed at the time permission was given to use the car, or that the owner had actual knowledge thereof at that time, or that it was a patent defect easily discoverable, or that there was a failure to inspect, so as to impute constructive knowledge thereof. The burden was on plaintiff to establish these elements by substantial evidence, but she has failed to meet these requirements. It is our plain duty to rule that no submissible case was made against the owner of the car, Eugene Waelder, on the theory that he knowingly permitted a defective car to travel the highways, and the judgment against the latter on plaintiff's petition must be reversed.
Respondent contends that Instruction P-3, which is the only instruction given by plaintiff on this theory, is directed at both defendants and that we should consider Jack Waelder's liability thereunder. A casual reading of the instruction, however, clearly reveals that it directs a verdict only as against Eugene Waelder. That being true, there is no occasion on this appeal to consider the further point raised by appellant Eugene Waelder, namely, that there was not sufficient proof that the defective condition caused or contributed to cause the collision. In view of the fact, however, that it will be necessary, as we shall see, to remand the case for a new trial as against Jack Waelder, and inasmuch as the petition charges Jack Waelder under the theory of driving a defective automobile, and plaintiff on another trial may seek to establish this liability against Jack Waelder, we deem it proper to note that there was no expert or nonexpert evidence in this record that it is a common practice to swerve a car to the right or left to "pull out of a shimmy" (as suggested in respondent's brief in explanation of the movements of the Waelder car) or that the kind or extent of the shimmy shown to have existed in the Plymouth car could have interfered with the normal operation of the car, or could have affected the direction in which it was being propelled, or could have caused the operator to lose control.
Turning now to the only complaint made in the briefs with respect to the action on the counterclaims in the trial court, let us consider the assignment of error in giving that part of Instruction P-6 which reads: "And in this connection, you are further instructed that the defendant Eugene Waelder cannot recover from plaintiff upon his counter-claim if you find and *856 believe from the evidence that the defendant Jack Waelder was guilty of acts of negligence which concurred with the plaintiff's negligence, if any, in causing the collision and damages, if any."
By this clause the jury was instructed that the negligence of a bailee may be imputed to the bailor, which is directly contrary to the settled law of this state as declared in Stoeckle v. St. Louis & H. R. Co., 214 Mo.App. 124, 258 S.W. 58, and Niedner v. Wabash R. Co., Mo.App., 219 S.W.2d 886. In this respect Eugene Waelder was necessarily prejudiced in the submission of his counterclaim, as a result of which a new trial must be granted thereon.
Appellant Jack Waelder attacks plaintiff's Instruction P-2 in its use of the term "unnecessary" speed, and for including in paragraph 3 a basis of liability predicated necessarily upon the finding of a "zone of apparent danger," and in other respects. We are compelled to conclude that Instruction P-2 was prejudicially erroneous for several reasons. In the first place, it was error to submit paragraph 3, which reads: "3In negligently failing to have their said automobile under such control that it could readily and reasonably be stopped on the appearance of danger" for the reason that the instruction failed to hypothesize the specific acts of negligence and the various factual elements and circumstances relating to control of the automobile and the appearance of danger as given in evidence. Consequently the jury was turned loose in the wide field of conjecture and speculation, armed with the power to determine both the law and the facts, without any proper guide. Thus in Annin v. Jackson, 340 Mo. 331, 100 S.W.2d 872, 875, where the pertinent portions of the instruction read as follows: " * * * failed and omitted to have said automobile under control so that it could be readily and reasonably stopped or swerved or the speed thereof slackened upon the appearance of danger * * *," a judgment for the plaintiff was reversed because, among other things, "there was no direction as to what acts were for consideration * * * in determining negligence vel non." See also Rosenkoetter v. Fleer, Mo.Sup., 155 S.W.2d 157; Carson v. Evans, 351 Mo. 376, 173 S.W.2d 30; Hicks v. De Luxe Cab Co., Mo.App., 189 S.W.2d 152; Nowlin v. Kansas City Public Service Co., Mo.App., 58 S.W.2d 324.
Furthermore, the assignment of negligence in paragraph 1 thereof, employing as it does the word "unnecessary" constituted a roving commission to the jury, because the word "unnecessary" as applied to speed would provide no assistance whatever to a jury as a guide or standard by which to judge conduct but on the contrary would serve only to confuse and mystify. Incidentally, the word "unnecessary" is not included in the charge of excessive speed in plaintiff's petition.
It must be further pointed out, although not raised by the appellants, that no issues of fact were submitted in paragraph 1 of Instruction P-2 for the jury to determine what constituted "fast", "dangerous" or "negligent" speed, under the latest ruling decisions of the Supreme Court requiring "precise and specific factual hypothesization" where the parties offer conflicting evidence as to speed and circumstances. Dahlen v. Wright, Mo.Sup., 235 S.W.2d 366; Green v. Guynes, Mo.Sup., 235 S.W.2d 298; Yates v. Manchester, 358 Mo. 894, 217 S.W.2d 541.
It was error to give Instruction P-8 on the measure of damages. Paragraphs 5 and 6 submitted loss of earnings and expenditures or obligation for doctor's care and attention and for hospitalization. There was no evidence of loss of earnings. On the contrary, plaintiff testified positively that although several weeks elapsed before she received her salary, she eventually "got" all her salary. Including this item of recovery in the instruction without proof was reversible error. Ingles v. Metropolitan St. R. Co., 145 Mo.App. 241, 129 S.W. 493.
Similarly, it was reversible error to instruct on hospital and doctor bills without any evidence of the amount of such bills. The record is silent in this respect. We have no idea how much the jury may have included for these items *857 in its award. Doctors' bills are items of special damage and to be allowed must be supported by substantial evidence. Murphy v. S. S. Kresge Co., Mo.App., 205 S.W.2d 252.
Appellants contend that Instruction P-4 is erroneous wherein "highest degree of care" is defined as " * * * the highest practicable degree of care which a very prudent person would use under the same or similar facts * * *." Since appellants offered no definitive instruction of their own they are hardly in a position to raise the point, Silsby v. Hinchey, Mo.App., 107 S.W.2d 812, unless it constituted positive misdirection. As pointed out by respondent, the identical instruction was held not harmful to the defendant in Allen v. Purvis, Mo.App., 30 S.W.2d 196. A better and more recently approved definition of "highest degree of care" is set forth in Woods v. Chinn, Mo.App., 224 S.W.2d 583, 587.
Since the case must be remanded on other grounds, and since they will not be appropriate in their present form for use at the new trial in view of what has been said in this opinion, we need not decide the now academic question whether Instructions P-1, P-2 and P-3 are conflicting, inconsistent and inter-destructive, as contended by appellants. These are questions which necessarily will be eliminated at the next trial.
The judgment must be reversed and the cause remanded. The issues for trial on remand will be (1) plaintiff's case against Jack Waelder on her petition, (2) Jack Waelder's case against plaintiff on his counterclaim, and (3) Eugene Waelder's case against plaintiff on his counterclaim. The fourth issue, namely, plaintiff's case against Eugene Waelder on her petition, is at rest for the reasons stated in this opinion, but the trial court should hold in abeyance the entry of judgment on that issue until the final disposition of the issues herein remanded for new trial, at which time final judgment shall be entered by the trial court on all claims and counterclaims.
The judgment on the issues raised by the counterclaim of Jack Waelder, (2) above, not having been challenged and there having been no assignment of errors or briefing with respect thereto, it ordinarily would follow that the judgment thereon would be regarded as final and the issues at rest. Johnson v. Fogertey Bldg. Co., Mo.App., 194 S.W.2d 924. In the case at bar, however, it is necessary to upset plaintiff's favorable judgment on Jack Waelder's counterclaim notwithstanding the appeal thereon has not been perfected, for the reason that the issues are so interrelated and interdependent when considered in connection with (1) above that the trial of one necessarily involves the trial of the other. The identical situation was encountered in Bramblett v. Harlow, Mo.App., 75 S.W.2d 626. The petition and counterclaim of Jack Waelder involved the identical issue, whether the driver of the Vogelgesang car or of the Waelder car is ultimately responsible for the collision, or whether they are both responsible therefor. The proof of plaintiff's claim under her petition will disprove the defense of Jack Waelder, and will disprove his counterclaim, which not only relies on plaintiff's contributory negligence as defensive matter to defeat her claim against him, but also counts upon the same acts and omissions on the part of plaintiff as the basis for his prayer for affirmative relief. The two are inseparable. To attempt to divorce them and try the plaintiff's negligence before one jury and Jack Waelder's negligence before another, all in the same lawsuit and with the necessity of one final judgment, would be to invite inconsistent verdicts, require the impossible in the admission and rejection of evidence, and would inevitably result in injustice. Plaintiff's claim and Jack Waelder's counterclaim are not independent, distinct and capable of separation. Since plaintiff's claim under her petition must be remanded for retrial, Jack Waelder's counterclaim, which is inextricably bound up and interwoven with plaintiff's claim, must also be sent back with it. In addition to the Bramblett v. Harlow case, supra, see also Napier v. Ferris, Mo.App., 159 S.W.2d 364, and Hoefel v. Hammel, Mo.App., 228 S.W.2d 402.
*858 The judgment of the circuit court should be reversed, and the cause remanded for a new trial and for the entry of judgment, all in accordance with the directions contained in this opinion, and the Commissioner so recommends.
PER CURIAM.
The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.
The judgment of the trial court is, accordingly, reversed and the cause remanded with directions.
ANDERSON, P. J., and McCULLEN and BENNICK, JJ., concur.