(No. 41023.—

BENJAMIN E. DUNHAM, Appellee, *vs.* VAUGHAN & BUSH-NELL MFG. Co. *et al.,* Appellants.

*Opinion filed January 29, 1969.—Rehearing denied March 25, 1969.*

EARL S. HODGES, and GREEN AND HOAGLAND, both of Springfield, (SAMUEL C. PATTON and ROBERT B. MAUCKER, of counsel,) for appellants.

McGRADY AND MADDEN, of Gillespie, for appellee.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

A jury in the circuit court of Macoupin County returned a verdict in the sum of $50,000 in favor of the plaintiff, Benjamin E. Dunham, and against the defendants, Vaughan & Bushnell Mfg. Co. and Belknap Hardware and Mfg. Co. Judgment was entered on the verdict and the Appellate Court for the Fourth Judicial District affirmed. (86 Ill. App. 2d 315.) We allowed the defendants' petition for leave to appeal.

The injury that gave rise to this action occurred while the plaintiff was fitting a pin into a clevis to connect his tractor to a manure spreader. He had made the connection on one side, using a hammer to insert the pin. To insert the second pin he lay on his right side underneath the tractor and used the hammer extended about two and one-half feet above his head. The hammer moved through an arc which he described as about 8 inches. He testified that as he undertook to "tap" the pin into the clevis a chip from

the beveled edge of the hammer, known as the chamfer, broke off and struck him in the right eye. He lost the sight of that eye.

The hammer in question is a claw hammer of the best grade manufactured by the defendant Vaughan & Bushnell Mfg. Co. It bore the "Blue-Grass" trademark of its distributor, the other defendant, Belknap Hardware and Manufacturing Co. The plaintiff had received the hammer from a retailer, Heyen Implement Company, located near his home. He received it as a replacement for another "Blue-Grass" hammer, the handle of which had been broken. Before the accident occurred the plaintiff had used the hammer for approximately 11 months in connection with his farming and custom machine work. He had used it in repairing a corn crib and had also used it in working upon his farming implements and machinery.

Each party offered the testimony of an expert metallurgist. Neither expert found any flaws due to the forging of the hammer or any metallurgical defects due to the process of manufacture. The experts agreed that the hammer was made of steel with a carbon content of "1080". The plaintiff's expert testified that such a hammer was more likely to chip or shear than one made of steel with a lower carbon content of "1040" which would not be so hard. The defendant's expert disagreed; it was his opinion that a hammer made of harder steel, with the higher carbon content, would be less likely to chip or shear than one made of steel with a lower carbon content. Both experts testified that use of a hammer produced a condition described as "work hardening" or "metal failure" which made a hammer more likely to chip or shear.

The defendants apparently suggest that the plaintiff should not have used a claw hammer to tap the pin into the clevis, because the mushroom head of the pin was made of steel of a "Rockwell" test hardness of C57 which was harder than the head of the hammer, which tested Rock-

well C52. But as the appellate court pointed out, the specifications of the General Service Administration, used by all Federal agencies, call for a Rockwell "C" hardness of 50-60 in carpenter's claw hammers and a Rockwell "C" hardness of 50-57 for machinist's ball-peen hammers. Those specifications also require that sample carpenter's claw hammers and sample ball-peen hammers be subjected to identical tests, by striking them against another hammer and against a steel bar, to determine their tendency to "chip, crack or spall". The specifications thus negate the defendant's suggestion that the plaintiff should have used a ball-peen hammer, rather than the hammer in question, in tapping the pin into the clevis.

The basic theory of the defendants in this court is that the requirements of strict liability, as announced in *Suvada* v. *White Motor Co.,* 32 Ill.2d 612, were not established because the testimony of the experts showed that the hammer contained no defect. *Suvada* requires a plaintiff to prove that his injury resulted from a condition of the product which was unreasonably dangerous and which existed at the time the product left the manufacturer's control. But the requirement that the defect must have existed when the product left the manufacturer's control does not mean that the defect must manifest itself at once. The defective "aluminum brake linkage bracket," with which the court was concerned in ruling upon the legal sufficiency of the complaint in *Suvada,* was alleged to have been installed in the tractor not later than March of 1957; it did not break until June of 1960.

Although the definitions of the term "defect" in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function. So, Chief Justice Traynor has suggested that a product is defective if it fails to match

the average quality of like products. (Traynor, The Ways and Meanings of Defective Products and Strict Liability, 32 Tenn. L. Rev. 363 (1965).) The Restatement emphasizes the viewpoint of the consumer and concludes that a defect is a condition not contemplated by the ultimate consumer which would be unreasonably dangerous to him. (Restatement, Torts (Second) § 402A, comment g.) Dean Prosser has said that "the product is to be regarded as defective if it is not safe for such a use that can be expected to be made of it, and no warning is given." (Prosser, The Fall of the Citadel, 50 Minn. L. Rev. 791, 826.) Dean Wade has suggested that apart from the existence of a defect "the test for imposing strict liability is whether the product is unreasonably dangerous, to use the words of the Restatement. Somewhat preferable is the expression 'not reasonably safe.'" (Wade, Strict Tort Liability of Manufacturers, 19 S.W. Law Journal 5, 15.) See also, Dean Keeton, Products Liability—Liability without Fault and the Requirement of a Defect, 45 Tex. L. Rev., 855, 859.

The evidence in this case, including both the General Services Administration specifications and tests and the testimony of the experts as to "work hardening" or "metal failure," shows that hammers have a propensity to chip which increases with continued use. From that evidence it would appear that a new hammer would not be expected to chip, while at some point in its life the possibility of chipping might become a reasonable expectation and a part of the hammer's likely performance. The problems arise in the middle range, as Chief Justice Traynor has illustrated: "If an automobile part normally lasts five years, but the one in question proves defective after six months of normal use, there would be enough deviation to serve as a basis for holding the manufacturer liable for any resulting harm. What if the part lasts four of the normal five years, however, and then proves defective? For how long should a manufacturer be responsible for his product?" Traynor, The Ways and

Meanings of Defective Products and Strict Liability, 32 Tenn. L. Rev. 363, 369-70 (1965).

The answers to these questions are properly supplied by a jury, and on the record that is before us this case presents only the narrow question whether there is sufficient evidence to justify the jury's conclusion that the hammer was defective. The record shows that it was represented as one of "best quality" and was not put to a use which was regarded as extraordinary in the experience of the community. The jury could properly have concluded that, considering the length and type of its use, the hammer failed to perform in the manner that would reasonably have been expected and that this failure caused the plaintiff's injury.

Strict liability, applied to the manufacturer of the hammer, Vaughan & Bushnell, extends as well to the wholesaler, Belknap Hardware and Mfg. Co., despite the fact that the box in which this hammer was packaged passed unopened through Belknap's warehouse. The strict liability of a retailer arises from his integral role in the overall producing and marketing enterprise and affords an additional incentive to safety. (See, *Vandermark* v. *Ford Motor Co.* (Cal. Sup. Ct. 1964), 37 Cal. Rptr. 896, 391 P. 2d 168.) That these considerations apply with equal compulsion to all elements in the distribution system is affirmed by our decision in *Suvada* v. *White Motor Co.*, 32 Ill.2d 612, 617. See, Restatement (Second) (1965), Torts § 402A, comment f.

The defendant's objections to the instructions to the jury were adequately disposed of in the opinion of the appellate court. The judgment of the appellate court is affirmed.

*Judgment affirmed.*