MARCY S. CROWE, Adm'r of the Estate of and Widow of John F. Crowe, Jr., Deceased, and Mother and Next Friend of Gregory John Crowe, Minor, Plaintiff-Appellant, *v.* THE PUBLIC BUILDING COMMISSION OF CHICAGO *et al.*, Defendants-Appellees.

First District (3rd Division) No. 62277

Opinion filed November 2, 1977.

SIMON, P. J., specially concurring.
McNAMARA, J., dissenting.

Nat P. Ozmon and Timothy M. O'Brien, of Horwitz, Anesi, Ozmon & Associates, of Chicago, for appellant.

Joseph S. King and Stanley J. Davidson, of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago, for appellee Arrow Contractors Equipment Company.

MISS JUSTICE McGILLICUDDY delivered the opinion of the court:
Marcy S. Crowe, administrator of the estate of and widow of John F. Crowe, Jr., deceased, and mother of Gregory John Crowe, a minor, brought an action against a number of defendants, including Arrow Contractors Equipment Company, to recover money damages due to the death of her husband.

John F. Crowe, Jr., was fatally injured on September 20, 1973, when he fell approximately 100 feet from a certain hoisting tower which was then

being used for a construction project at 2357 West Division Street in Chicago. At the time of his death, John Crowe was an employee of Interstate Steel Setters, Inc., one of the contractors working on the construction project. The tower from which the decedent fell had been leased by The George Sollitt Construction Company from Arrow in June 1972. In July 1973 this particular tower and other equipment owned by Arrow was sold to Southeastern Tower and Equipment Company, and the lease between Arrow and Sollitt was assigned to Southeastern by Arrow. This sale and assignment was part of a bulk sale of equipment by Arrow to Southeastern.

In count III of her complaint filed on April 3, 1974, Marcy Crowe alleged that Arrow, as one of the parties in the distribution chain relative to the hoisting tower, was liable under a strict liability theory. Arrow moved the court to dismiss count III with respect to Arrow on the grounds that the sale of the tower and assignment of the lease to Southeastern relieved Arrow of any liability under the products liability theory. Arrow's motion was granted in an order entered on March 7, 1975. The plaintiff subsequently moved for a rehearing on the motion of Arrow. This motion for a rehearing was denied on March 14, 1975. Marcy Crowe effectively raises two issues on appeal: whether defects in Arrow's motion to dismiss serve to invalidate that motion and whether the plaintiff's complaint states a cause of action against Arrow, as a matter of law, based upon the theory of products liability.

The complaint filed by Marcy Crowe excluded any references to the sale of the tower and assignment of the lease of that tower by Arrow to Southeastern; only facts relating to the original lease of the tower by Arrow to Sollitt were alleged by the plaintiff in the complaint. Arrow, therefore, appended to its motion to dismiss certain documents which indicated that, at the time of the accident, it was no longer the owner or lessor of the tower; Arrow did not, however, include any affidavit to support its motion. Crowe now contends on appeal that because Arrow's motion to dismiss was unverified, the additional facts relating to the sale and assignment were not properly before the court. Absent those additional allegations, Crowe argues that the sufficiency of count III of the complaint can be adjudicated only with respect to the facts apparent on the face of the complaint, and since those allegations clearly establish a cause of action against Arrow on a products liability theory, she argues that the order dismissing Arrow was improperly entered.

■■ It is true that where a motion to dismiss made under the authority of section 48 of the Civil Practice Act is based upon grounds which do not appear on the face of the complaint, the motion must be supported by affidavit (Ill. Rev. Stat. 1975, ch. 110, par. 48(1)). However, the record shows that the plaintiff is raising this issue for the first time on appeal. In

addition, in opposition to the motion to dismiss, she filed copies of the sales and assignment agreements between Arrow and Southeastern—documents which were also attached to Arrow's motion. Given these circumstances, we feel that Crowe has clearly waived this objection. *In re Leyden Fire Protection District* (1972), 4 Ill. App. 3d 273, 280 N.E.2d 744; *Burdin v. Jefferson Trust & Savings Bank* (1971), 133 Ill. App. 2d 703, 269 N.E.2d 340.

The second issue, relating to whether Arrow can be liable for damages under a products liability theory, presents what we perceive to be a rather unique question. Arrow's position in the chain of distribution of the tower must be characterized as that of a former owner and a former lessor of the tower. While in Illinois an operator of a rental business can be held strictly liable for defects in products which he has leased (*Galluccio v. Hertz Corp.* (1971), 1 Ill. App. 3d 272, 274 N.E.2d 178), neither party has cited, nor have we found, a products liability case which adjudicates the liability of a former owner and a former lessor of a product.

■■ The imposition of strict liability upon suppliers of defective products was embraced by the courts as a means of ensuring greater protection for the consumer by finessing some of the problems inherent in the more traditional theories of warranty and negligence. The reasons for placing the risk of loss upon the suppliers of products are, by this time, well known: that the general public interest in human life and health demands protection from defective products, that the burden belongs on the suppliers who, in soliciting for the use of their product, represent that it is safe and suitable for that particular use and that the general considerations of justice dictate that those who create the risk and reap the profit should also bear the loss. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182. See also *Peterson v. Lou Bachrodt Chevrolet Co.* (1975), 61 Ill. 2d 17, 329 N.E.2d 785.) Applying this rationale to the problem of the scope of the strict liability doctrine, the courts have concluded that all participants in the chain of distribution of the product, including manufacturers, wholesalers and retailers, will be held to the strict liability standard. (*Peterson; Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401; *Suvada.*) Operators of rental businesses have likewise been included within the doctrine primarily because the position of a commercial lessor in the distribution system of a product is so analogous to that of a retailer, the courts have seen no need to differentiate between the two for the purpose of applying the strict liability doctrine. *Galluccio v. Hertz Corp.* (1971), 1 Ill. App. 3d 272, 277-278; *Cintrone v. Hertz Truck Leasing & Rental Service* (1965), 45 N.J. 434, 212 A.2d 769; *Price v. Shell Oil Co.* (1970), 2 Cal. 3d 245, 466 P.2d 722, 85 Cal. Rptr. 178.

It seems clear that, in the present case, had the sale of the tower and assignment of the lease not taken place, Arrow would be a proper

defendant under a strict liability theory. The question that must be asked then is whether a lessor may escape liability by selling the product and assigning a lease covering that product to another individual or entity. We believe that he cannot.

Arrow was undeniably a principal participant in the "stream of commerce" relating to this tower. As a party to the original lease, Arrow acted as the initial distributor of the product and, presumably, had some influence over the definition of the terms of the lease. It is also apparent that Arrow's role in the transaction was more than that of a mere conduit. The tower had to be constructed from component parts; therefore, Arrow not only supplied the parts from which the tower was built but also arranged to have an independent contractor construct it. In *Dunham* strict liability was imposed upon a wholesaler despite the fact that the box in which the defective hammer was packaged passed unopened through the wholesaler's warehouse. Certainly, Arrow played a more active role in the distribution of the allegedly defective product than did the wholesaler in *Dunham*. Recognizing the desire of the courts to place the risk of loss on those responsible for the distribution of defective products, we believe that the role played by Arrow in causing the distribution of the tower which injured John Crowe was extensive enough to warrant holding Arrow to the strict liability standard.

For the above stated reasons, the order of the circuit court granting the defendant's motion for dismissal as to Arrow is hereby reversed and the cause is remanded to the circuit court for further proceedings not inconsistent with this opinion.

Reversed and remanded with directions.

Mr. PRESIDING JUSTICE SIMON, specially concurring:

Although I agree with the reasoning and holding of my colleague, Justice McGillicuddy, I regard Arrow's role as something more than that of a former owner and a former lessor, and I believe that Arrow, in selling the tower and assigning the lease, actively contributed to the continuation of the lease.

Count III of the complaint alleges that Arrow designed, manufactured and assembled a defective tower which it then leased to Sollitt. Nothing in the record rebuts this allegation. While the evidence at trial may show that Arrow did not manufacture or assemble the tower in question, Arrow should be regarded as the assembler or manufacturer, so far as consideration of defendant's motion to dismiss is concerned. Although Arrow did not regularly sell towers, it did lease them on a regular basis. There is no significant difference between a manufacturer who puts his product into commerce by a sale and one who does it by a lease. Thus, if Arrow assembled or participated in the assembly of a defective tower

which it then leased, it should be held to the same product liability responsibility it would have if it were in the business of assembling towers and selling them.

Even if Arrow was not an assembler of the tower, holding it accountable as the lessor of a defective product is consistent with the doctrine of strict product liability. By its lease with Sollitt, Arrow introduced the allegedly defective tower into the stream of commerce. Under the provisions of that lease, Arrow had the privilege of terminating the lease when it sold the tower to Southeastern. Instead of exercising that privilege to opt out of the distributive chain, Arrow chose to assign the lease. By leasing the tower and then assigning the lease, Arrow both introduced the tower into the stream of commerce and caused the tower to remain in that stream.

In *Galluccio v. Hertz Corp.* (1971), 1 Ill. App. 3d 272, 274 N.E.2d 178, the court, in relying upon *Cintrone v. Hertz Truck Leasing & Rental Service* (1965), 45 N.J. 434, 212 A.2d 769, emphasized that the strict product liability of a lessor is based on his expertise in knowing how long the leased product could safely be in service and the public exposed to it. In this case, if Arrow exercised any expertise, it was in favor of keeping the tower in operation by continuing the lease to Sollitt. As pointed out above, instead of removing itself from the distributive chain by terminating the lease at the time it sold the tower to Southeastern, Arrow indicated that it was proper and safe to permit the tower to remain in use by assigning the lease. Then, only 2 months after the assignment, while the lease Arrow initiated remained in effect, the workman whose executor filed this action was killed because of an alleged defect in the tower existing prior to the assignment. Under these circumstances, Arrow should not be absolved from strict product liability. By its assignment of an existing lease under which it was the original lessor, Arrow both reaped a profit and insured the leased product would remain in commerce. Arrow, therefore, should continue to bear the burdens of its conduct during the pendency of the lease.

Although plaintiff has an action pending against Southeastern, she may be prejudiced if she is not also permitted to maintain her action against Arrow. No one can predict whether Southeastern will be able to respond financially to any judgment which may be entered against it.

I therefore concur in the conclusion that count III of the complaint states a cause of action on a strict product liability theory against Arrow.

Mr. JUSTICE McNAMARA, dissenting:

I respectfully dissent from the decision of my colleagues holding that count III of the complaint states a cause of action in strict products liability against Arrow Equipment Company.

In my view count III fails to state a cause of action against Arrow because the record establishes that Arrow was removed from the chain of distribution of the allegedly defective tower through the sale of the tower and assignment of the lease two months prior to the accident involving plaintiff's decedent. In her complaint, plaintiff made no reference to the fact that on July 12, 1973, Arrow sold the tower as part of a bulk sale transaction and assigned all outstanding leases to Southeastern Tower and Equipment Company. The assignment included the lease under which Arrow had rented the tower to the Sollitt Construction Company, the general contractor on the jobsite where plaintiff's decedent was injured fatally. The facts were set forth in Arrow's motion to dismiss and were supported by exhibits appended to the motion. The exhibits (contract of sale, assignment of leases, and rental agreement) established that from July 12, 1973, until September 20, 1973, the date of the accident, the tower was owned by Southeastern which then leased it to Sollitt.

Under Illinois law the commercial lessor occupies a position in the chain of distribution of a product which is comparable to that of a retailer. (*Galluccio v. Hertz Corp.* (1971), 1 Ill. App. 3d 272, 274 N.E.2d 178.) Accordingly, the leasing of a defective product renders the commercial lessor susceptible to the imposition of liability for resultant injuries under a strict products liability theory. The rationale employed by this court in imposing liability upon the lessor in *Galluccio* is that the lessor possesses expertise with respect to the service life and fitness of the product and controls the length of the lease which enables him to control the length of time during which such product will be in service and the public exposed to it. (*Galluccio v. Hertz Corp.*, 1 Ill. App. 3d 272, 277-78, citing *Cintrone v. Hertz Truck Leasing & Rental Service* (1965), 45 N.J. 434, 212 A. 2d 769.) In my view this rationale is applicable only when the party charged with liability was the lessor of the allegedly defective product at the time the injury occurred or when the circumstances of the case are such that the previous lessor has retained a present and active role in the chain of distribution.

When Arrow sold the tower and assigned the lease to Southeastern, it relinquished all control over the duration of the lease and the maintenance of the tower. Service people from Arrow visited the construction site for inspection and repair of the tower only up to the date of the sale and assignment of the lease. After July 12, 1973, Southeastern assumed control of the apparatus. Arrow thus was effectively removed from the chain of distribution as envisioned by this court in *Galluccio*. No Illinois case has been found which holds that a party who is the previous owner and lessor of an allegedly defective product may be held responsible under a theory of strict products liability when the accident occurs subsequent to a casual sale of the leased property and the lease is assigned to a third party. I

believe that such a holding is an extension of the law of products liability not supported by *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182; *Galluccio,* and their progeny. Under *Galluccio,* the plaintiff has filed a strict products liability action against Southeastern, the lessor at the time of the incident, and that action is pending. If plaintiff is able to establish that the tower was defective and that the defect caused the death of plaintiff's decedent, she will recover under the pending strict products liability suit. She is not prejudiced by a dismissal of such a suit against a former lessor.