(No. 50258.—

MARCY S. CROWE, Indiv. and as Adm'r, Appellee, v. THE PUBLIC BUILDING COMMISSION OF CHICAGO *et al.*—(Arrow Contractors Equipment Company, Appellant.)

*Opinion filed December 4, 1978.*

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Leonel I. Hatch, Jr., and Stanley J. Davidson, of counsel), for appellant.

Nat P. Ozmon and Curt N. Rodin, of Chicago (Horwitz, Anesi, Ozmon & Associates, Ltd., of counsel), for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

This action was filed in the circuit court of Cook County by Marcy S. Crowe, individually and as administrator of the estate of her husband. The action sought damages against numerous defendants for the injury and resultant death of her husband on September 20, 1973. The complaint contained three counts. The only count at issue here is count III, which alleged, among other things, that Arrow Contractors Equipment Company (Arrow) was engaged in the business of leasing equipment and that it leased a defective scaffold (characterized as a hoisting tower), which defective product proximately caused the fatal fall of her husband.

Arrow moved to dismiss on the basis that it had sold the hoisting tower and assigned its lease to Southeastern Tower and Equipment Company as part of a bulk sale of equipment on July 12, 1973. Arrow asserted in its motion to dismiss that, on the date of the accident, it was merely a former owner and lessor; that any liability which it may have had as owner and lessor of the tower had been transferred, by virtue of the sale, to Southeastern. The trial court granted Arrow's motion to dismiss and expressly found no just reason for delaying enforcement of its dismissal order. Pursuant to Rule 304(a) (58 Ill. 2d R.

304(a)), plaintiff appealed the order. The appellate court, in a majority decision, reversed. (54 Ill. App. 3d 699.) We granted Arrow leave to appeal.

The sole issue presented for review is whether strict tort liability applies to a *former* lessor of a defective product.

Arrow concedes that the extension of the doctrine of strict liability to the lessor of a defective product is an established principle of law in Illinois. (See *Galluccio v. Hertz Corp.* (1971), 1 Ill. App. 3d 272, *appeal denied* (1972), 49 Ill. 2d 575; *Lowrie v. City of Evanston* (1977), 50 Ill. App. 3d 376, 382, *appeal denied* (1977), 66 Ill. 2d 631; Annot., 52 A.L.R.3d 121, 131-32 (1973).) Arrow does not dispute the soundness of this principle, but posits that the rationale for imposing strict liability on lessors does not apply to *former* lessors. A brief review of the applicability of strict liability to lessors, we believe, will expose the fatal weaknesses in Arrow's position.

Ever since Illinois law first embraced the principles of strict liability in *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 619, this court has recognized the public policy justifications for imposing strict liability upon those who reaped a profit by placing a defective product in the stream of commerce. Imposition of strict liability upon sellers (wholesalers and retailers), as well as upon manufacturers, arises from their "integral role in the overall producing and marketing" of a defective product. (*Dunham v. Vaughan & Bushnell Mfg. Co.* (1969), 42 Ill. 2d 339, 344.) A seller who does not create a defect, but who puts the defective product into circulation, is still responsible in strict liability to an injured user. Because the ultimate loss will ordinarily be borne, through idemnification, by the party that created the defect, the public policy concern is really who, between the injured user and the seller, should bear the initial loss. The seller is in a position to prevent a defective product from entering the

stream of commerce. The seller may either adopt inspection procedures or influence the manufacturer to enhance the safety of a product. Moreover, the seller is generally better able to bear and distribute any loss resulting from injury caused by a defective product. See Restatement (Second) of Torts sec. 402A, comment *c* (1965).

The only obstacle to the natural extension of strict liability to lessors has been the applicable strict liability provision of the Restatement (Second) of Torts, section 402A, which refers expressly only to the strict liability of sellers. The section neither attempts to define those commercial transactions which may constitute a sale for purposes of attaching strict liability nor purports to confine the imposition of strict liability to sellers alone. The most persuasive interpretation of the section characterized the reference to sellers "as a description of the situation that has most commonly arisen rather than as a deliberate limitation of the principle to cases where the product has been sold, intentionally excluding instances where a manufacturer has placed a defective article in the stream of commerce by other means." *Delaney v. Towmotor Corp.* (2d Cir. 1964), 339 F.2d 4, 6; quoted with approval in *Cintrone v. Hertz Truck Leasing & Rental Service* (1965), 45 N.J. 434, 453, 212 A.2d 769, 779; *Perfection Paint & Color Co. v. Konduris* (1970), 147 Ind. App. 106, 114-15, 258 N.E.2d 681, 686.

The limited language of the Restatement has not deterred Illinois, or the majority of jurisdictions which have considered the question, from extending strict liability to lessors. (See Annot., 52 A.L.R.3d 121 (1973).) Courts have recognized that commercial leasing has become an increasingly practicable way for businesses to market their products. (*Price v. Shell Oil Co.* (1970), 2 Cal. 3d 245, 251-52, 466 P.2d 722, 726, 85 Cal. Rptr. 178, 182; also see B. Henszey, *Application of Strict Liability to the Leasing Industry,* 33 Bus. Law. 631 (1978).) The

nature of a commercial transaction by which a product is placed in the stream of commerce is irrelevant to the policy considerations which justify strict liability. A lessor is subject to strict liability because his position in the "overall producing and marketing enterprise" (42 Ill. 2d 339, 344) is no different from that of a seller. Typically, the commercial lessor is within the original chain of distribution and reaps a profit by placing a product in the stream of commerce. At the point in the chain of distribution where the product passes through the hands of the lessor, he becomes as capable as a seller to prevent a defective product from proceeding through the stream of commerce. As one court observed in imposing strict liability on a truck lessor:

> "The operator of the rental business must be regarded as possessing expertise with respect to the service life and fitness of his vehicles for use. That expertise ought to put him in a better position than the bailee to detect or to anticipate flaws or defects or fatigue in his vehicles. Moreover, as between bailor for hire and bailee the liability for flaws or defects not discoverable by ordinary care in inspecting or testing ought to rest with the bailor just as it rests with a manufacturer who buys components containing latent defects from another maker, and installs them in the completed product, or just as it rests with a retailer at the point of sale to the customer."
> (*Cintrone v. Hertz Truck Leasing & Rental Service* (1965), 45 N.J. 434, 450-51, 212 A.2d 769, 778.)

Consequently, the public policy rationale which justifies the use of strict liability as a means of shifting the burden of initial loss from the injured user applies with equal force whether the defective product is placed in the stream of commerce by a seller or by a lessor.

We discern two grounds upon which Arrow attempts to distinguish a lessor and a *former* lessor for the purposes of strict liability. First, Arrow asserts that as a former lessor it had no ability to supervise or inspect the towers during the duration of the lease, and, therefore, that it could not prevent defects or safeguard the public from injury. The implication is that strict liability should not be imposed upon former lessors because they cannot control risks of injury which inhere in defective products. We are not persuaded by Arrow's reasoning. Strict liability is imposed upon those in the original chain of distribution not because of their ability to prevent or rectify defects *after* the product passes through their hands. It is the decision of each party in the distribution chain to allow a defective product to proceed into the stream of commerce which subjects that party to strict liability. This becomes clear in the context of a seller. When a seller sells a defective product, the seller retains no residual ability to control the product at a later date. It is obviously of no consequence to consider a seller in that chain of distribution a former seller. If the product proves defective and if the defect existed at the time a product left a particular seller's control, that seller is subject to strict liability for injury resulting from the defect.

The same applies to a lessor. A lessor in the original distribution chain is in a position during the time the product is within its control to prevent a defective product from entering the stream of commerce. If a lessor retains no ability to control the product once the product enters the stream of commerce, the lessor would still be accountable in strict liability for defects which existed at the time the product left the lessor's control. A lessor who becomes a former lessor (as here, by selling the product and assigning the lease) is no less responsible in strict liability for those defects which existed when it originally permitted the product to be leased. Arrow, on the basis of

its integral role as lessor within the original chain of distribution, remains, as former lessor, subject to strict liability for defects which existed at the time the product left its control.

Second, Arrow contends that as a former lessor it was no longer in the *best* position to prevent defects or to prevent injury to the public. Arrow points out that Southeastern, the owner and lessor of the tower at the time of the accident, was in a better position to detect defects and to terminate the lease if necessary to prevent injury. As we have already stated, all those who play an "integral role in the overall producing and marketing enterprise" (42 Ill. 2d 339, 344) by placing a defective product in the stream of commerce are initially held accountable in strict liability. As between the injured user and any of the participants in the distribution chain, the relative responsibility of those within the distribution chain is not a consideration.

We conclude that the rationale for imposing strict liability on sellers and lessors applies with equal compulsion to *former* lessors. Former lessors have reaped a profit by placing a product in the stream of commerce. They do not nullify or diminish their role in the original distribution chain by divesting interest in the product subsequent to the original lease. Moreover, they are in the same position as a seller or lessor to be indemnified for any loss if the defect was created by another party within the original distribution chain.

For the reasons stated, we affirm the judgment of the appellate court. The cause is remanded to the circuit court of Cook County for further proceedings consistent with this opinion.

*Affirmed and remanded.*