ABCO METALS CORPORATION,
Plaintiff,

v.

J.W. IMPORTS COMPANY, INC., et al., Defendants.

No. 82 C 169.

United States District Court,
N.D. Illinois, E.D.

Sept. 13, 1982.

C. Philip Curley, Burke & Smith Chartered, Chicago, Ill., for plaintiff.

John Powers Crowley, Cotsirilos & Crowley, Ltd., Laurie G. MacFarlane, Miriam J. Frank, Katten, Muchin, Zavis, Pearl & Galler, Gary W. Leydig, William G. Swindal, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

Plaintiff, Abco Metals Corporation ("Abco"), has filed its amended complaint in this diversity action against three defendants, J.W. Imports Company, Inc. ("J.W. Imports"), E. Laursens Maskinfabrik ("Laursens"), and Equico Lessors, Inc. ("Equico"), alleging breach of express warranties, breach of implied warranties of merchantability, breach of implied warranties of fitness for a particular purpose, strict products liability, negligence, and breach of contract. All nine counts of the complaint involve the delivery and use of an allegedly defective wire chopper manufactured by defendant Laursens, a Denmark corporation. Each of the three defendants has filed a motion to dismiss at least some of the counts. Defendant Laursens has moved to dismiss all counts against it, including counts stating causes of action for breach of express warranties (Count I), breach of implied warranties (Counts III and V), strict liability in tort (Count VII), and negligence (Count VIII). Defendant J.W. Imports has filed an answer to the breach of warranties counts against it (Counts II, IV and VI), and has joined in Laursens' motion to dismiss the tort counts (Counts VII and VIII). Finally, Equico has

moved to dismiss the only two counts naming it as a defendant, which allege strict liability (Count VII) and breach of contract (Count IX). After a short statement of the facts, each motion will be discussed in turn.

## I. *Factual Background.*

The following facts have been alleged in plaintiff's amended complaint filed on May 14, 1982 ("complaint"), which, for the purpose of these motions, must be considered as true. In early 1980, Abco contacted J.W. Imports to inquire about buying a large capacity wire chopper and granulator for use in Abco's scrap metal processing business. A wire chopper is used in the recycling of insulated wire and cable. Among other things, it strips insulation from the metal conductor in the wire, usually copper, which is then sold to a refiner for reprocessing. Abco had had prior business dealings with J.W. Imports, and had previously purchased a smaller capacity wire chopper and granulator. Like the one involved here, the smaller wire chopper had been manufactured by Laursens, for whom J.W. Imports was the exclusive distributor in North America.

A meeting was arranged to discuss Abco's particular requirements and the details of the newly proposed sale. Those present at the meeting included Ray Ebinger, president of Abco; Jorgen Warrer, president of J.W. Imports, and Ole Christiansen, an engineer employed by Laursens. According to the complaint, Ebinger specifically told Warrer and Christiansen that Abco needed a wire chopper capable of processing mixed # 2 insulated wire at a rate of 10,000 pounds per hour. Warrer and Christiansen agreed that Laursens would build for Abco and J.W. Imports would sell to Abco the wire chopper. Allegedly, Warrer and Christiansen guaranteed that the wire chopper would meet the requirements outlined by Ebinger. The purchase price of the machine was $151,000.00.

The sale of the wire chopper was structured in the following manner. Laursens was to manufacture the wire chopper and sell it to J.W. Imports. It was agreed that J.W. Imports would then sell the wire chopper to Equico, an equipment leasing company, who would "lease" it to Abco. Pursuant to that arrangement, Abco forwarded a substantial security deposit to J.W. Imports, and a purchase order was exchanged between Equico and J.W. Imports, with a copy being sent to Abco.

Abco and Equico then executed an agreement stated in the terms of a lease. Under the agreement, Abco made an initial payment to Equico of $55,152.50, to be followed by sixty monthly payments of $2,459.00, in exchange for the wire chopper. Contemporaneously with that agreement, Abco and Equico also executed a purchase option, pursuant to which Abco could purchase the wire chopper from Equico at the expiration of the sixty-month period for $10,000. Plaintiff alleges that Laursens and J.W. Imports were informed that the arrangement with Equico was strictly for financing purposes, and that notwithstanding the "lease" characterization, the import of the entire arrangement was that Abco was purchasing the wire chopper from J.W. Imports and Laursens.

The wire chopper was delivered to Abco in June 1980. After accepting the machine, Abco learned that the chopper was not capable of operating at a 10,000 pounds per hour capacity, and that it could not process mixed # 2 insulated wire. Shortly after Abco discovered that the wire chopper did not meet the expected specifications, it notified both Laursens and J.W. Imports of the problem. Laursens and J.W. Imports both assured Abco that the problems would be cured. Abco alleges that in fact the problems were not solved, and that the wire chopper has never operated satisfactorily. As a consequence, Abco claims that it has suffered damages from the purchase of the wire chopper itself, from its purchase of additional equipment to be integrated with the wire chopper, the maintenance and installation of the wire chopper, the destruction of wire that was processed in the chopper, and lost profits.

## II. Laursens' Motion to Dismiss Warranty Counts.

In Counts I, III, and V, Abco alleges that the failure of the wire chopper to work as expected constituted a breach by Laursens of each of the three types of warranties created by the Uniform Commercial Code. In Count I, Abco claims that the statements from Laursens' representatives to the effect that the wire chopper would process 10,000 pounds of mixed # 2 insulated wire were affirmations of fact and promises constituting express warranties which were subsequently breached when the chopper did not work. Abco alleges in Count III that the wire chopper, as delivered, was not fit for the ordinary purposes for which wire choppers are used, and, therefore, Laursens breached its implied warranty of merchantability. Finally, Count V alleges that, at the time Laursens manufactured the wire chopper for Abco, Laursens was aware of the particular purposes and needs of Abco, and the failure of the wire chopper to meet those purposes constituted a breach of the implied warranty of fitness for a particular purpose. See Uniform Commercial Code, §§ 2–313, 2–314, and 2–315, Ill.Rev.Stat. ch. 26, §§ 2–313, 2–314, and 2–315.

Laursens attacks all three of the warranty counts on essentially the same grounds. Relying on the structure of the deal between the various parties, Laursens claims that there was no contract between it and Abco. Rather, Laursens notes that the wire chopper was first sold to J.W. Imports, then sold to Equico, who finally leased it to Abco. Therefore, Laursens argues that it is not in privity of contract with Abco. According to Laursens, without privity of contract between Laursens and Abco, the breach of warranty claims do not state causes of action.

■ Initially, the court notes that the parties apparently assume that Illinois law should govern this diversity action. Without any suggestion to the contrary, the court agrees with the parties' assumption. Turning to Laursens' specific arguments, Illinois law does not always require privity of contract between the user and the manufacturer of the product, at least insofar as the enforceability of implied warranties of merchantability and fitness for a particular purpose are concerned.

"[G]enerally privity only extends to the parties to the sale and implied warranties are not applicable between the buyer and a remote manufacturer.... This is not true, however, where there is a direct relationship between the manufacturer and the seller ..., or where, as here, the manufacturer knew the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements."

*Franks' Maintenance & Engineering, Inc. v. C.A. Roberts Co.,* 86 Ill.App.3d 980, 992–93, 42 Ill.Dec. 25, 408 N.E.2d 403 (1st Dist.1980) (citations omitted). *See Rhodes Pharmacal Co. v. Continental Can Co.,* 72 Ill.App.2d 362, 372–73, 219 N.E.2d 726 (1st Dist.1966).

■ From the allegations of plaintiff's complaint, it is apparent that both conditions for avoiding the privity requirement may exist in this case. Abco has alleged facts indicating that there was a direct relationship between it and Laursens involving the wire chopper. Laursens' employee was present at the meeting where the purchase of the wire chopper was discussed, and he promised the machine would meet Abco's requirements. Abco notified Laursens when the wire chopper did not operate as expected. After the notification, Laursens assured Abco that the chopper would be fixed, and evidently took some steps to do so, though the attempted repairs failed. Those allegations, if true, establish the requisite direct relationship between Abco and Laursens. Likewise, the same allegations show that Laursens was well aware that Abco was J.W. Imports' customer, and that Laursens was informed of Abco's purpose in buying the wire chopper and of Abco's particular requirements. Given plaintiff's allegations, privity of contract between Abco and Laursens was not necessary for the implied warranties to arise.

■ This leaves only Laursens' arguments concerning the express warranty. Apparently, the Illinois courts have not directly considered whether the privity requirement for express warranties will be eased under the same conditions that allow the requirement to be relaxed for the purposes of implied warranties. In dictum, however, an early Illinois decision suggested that no distinction should be made between express and implied warranties:

> "Since the Uniform Commercial Code, effective in 1962, adopts the third-party beneficiary language in discussing the effect of *express and implied* warranties, it seems that this doctrine should be extended here to a situation where a seller makes a product for a user who is not a direct buyer, but with whom the seller has direct dealings."

*Rhodes Pharmacal, supra,* 72 Ill.App.2d at 372, 219 N.E.2d 726 (emphasis added). The effect of that language is to broaden the definition of the term "seller" in UCC § 2–213 to include all those within the chain of production with whom the ultimate user of the product had direct and substantial contact. Laursens has not identified any Illinois precedent which would suggest that the Illinois courts would rule differently when faced with this question, nor has Laursens suggested any other compelling reasons to distinguish between implied and express warranties.

■ Finally, reading Abco's allegations liberally, the court believes that an oral contract concerning the wire chopper may exist between Abco and Laursens; a contract sufficient to meet the privity requirement should it be necessary to do so. Laursens' statements at the meeting, later contacts between Laursens and Abco delineated in Ebinger's affidavit filed by Abco, and Laursens' efforts to fix the allegedly defective wire chopper all may evidence the existence of such a contract. There is no question that oral statements made in the course of such a relationship may rise to the level of express guaranties. *See Capital Equipment Enterprises, Inc. v. North Pier Terminal Co.,* 117 Ill.App.2d 264, 254 N.E.2d 542 (1st Dist.1969). Laursens' motion to dismiss the warranty counts against it will be denied.

### III. Laursens' and J.W. Imports' Motions to Dismiss Tort Counts.

■ Laursens has also moved to dismiss Counts VII and VIII of the complaint. J.W. Imports has joined in that part of Laursens' motion and has adopted the arguments raised by Laursens. In Count VII, Abco alleges that the wire chopper was defective and unreasonably dangerous when it left the control of the three defendants, and that, as a result, Abco suffered damage to its property, specifically, a quantity of mixed # 2 insulated wire that was processed in the chopper and destroyed. Abco claims that the three defendants are strictly liable for the damage that resulted. In Count VIII, Abco alleges that Laursens and J.W. Imports were negligent in providing a defective wire chopper, and that the negligence resulted in the same damage to Abco's wire as was alleged in Count VII.

Laursens' arguments in support of dismissing Abco's tort claims are based on the Illinois Supreme Court's recent opinion in *Moorman Manufacturing Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). There, the Illinois court held that a plaintiff may not recover for "solely economic loss[es]" resulting from a product defect on either strict liability or negligence theories, but rather the plaintiff was required to look to the warranty remedies provided by the UCC. *Id.* at 81, 61 Ill.Dec. 746, 435 N.E.2d 443. Laursens claims that Abco is attempting to recover only its economic losses, and has failed to allege the occurrence of any accident "involving some violence or collision with external objects" caused by the defect. *Id.* at 83, 61 Ill.Dec. 746, 435 N.E.2d 443 (quoting Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum L.Rev. 917, 918 (1966)). Abco has responded by arguing that it is claiming more than damages for its solely economic loss. It is also claiming damages for its property—the mixed # 2 insulated wire—which was destroyed because of the defects in the wire chopper.

It appears that Abco's analysis of the majority's opinion in *Moorman* is correct. The holding there was stated in two parts:

"We ... hold that, where only the defective product is damaged, economic losses caused by qualitative defects falling under the ambit of a purchaser's disappointed expectations cannot be recovered under a strict liability theory."

*Id.,* 91 Ill.2d at 85, 61 Ill.Dec. 746, 435 N.E.2d 443.

"We do hold, however, that when a product is sold in a defective condition that is unreasonably dangerous to the user or consumer or to his property, strict liability in tort is applicable to physical injury to plaintiff's property, as well as to personal injury."

*Id.* at 81, 61 Ill.Dec. 746, 435 N.E.2d 443. Based on those two quotes, the Illinois court has drawn the relevant distinction between those situations where the defective product simply breaks down and situations where the defective product destroys some other items of the plaintiff's property in the course of the breakdown. In the latter case, tort remedies are available to the plaintiff. Here, Abco has alleged that the wire chopper did not simply break down, but that in doing so, it also destroyed a substantial amount of Abco's property. Under Illinois law, therefore, Abco's tort claims do state causes of action.

IV. *Equico's Motion to Dismiss.*

Equico is named as a defendant in only two of the nine counts of plaintiff's amended complaint. In Count VII, as discussed above, Abco states a claim against Equico and the other defendants based on the theory of strict liability for defective products (products liability). In Count IX, which applies only to Equico, Abco claims that Equico breached its contract with Abco by failing to supply consideration, specifically because the wire chopper never worked as specified. Equico has raised separate arguments for dismissal of the two counts against it, which will be considered in turn below.

Concerning Count VII, Illinois law recognizes that strict products liability may be applied to commercial lessors who rent out defective products. *See Crowe v. Public Building Commission,* 74 Ill.2d 10, 23 Ill. Dec. 80, 383 N.E.2d 951 (1978). The Illinois Supreme Court justified the extension of Section 402A of the Restatement (Second) of Torts to include lessors as well as sellers by observing,

"A lessor is subject to strict liability because his position in the 'overall producing and marketing enterprise' ([*Dunham v. Vaughan & Bushnell Manufacturing Co.,*] 42 Ill.2d 339, 334 [247 N.E.2d 401]) is no different from that of a seller. Typically, the commercial lessor is within the original chain of distribution and reaps a profit by placing a product in the stream of commerce. At the point in the chain of distribution where the product passes through the hands of the lessor, he becomes as capable as a seller to prevent a defective product from proceeding through the stream of commerce.... Consequently, the public policy rationale which justifies the use of strict liability as a means of shifting the burden of initial loss from the injured user applies with equal force whether the defective product is placed in the stream of commerce by a seller or by a lessor."

*Id.* at 15, 23 Ill.Dec. 80, 383 N.E.2d 951.

Equico argues, however, that despite the Illinois court's ruling in *Crowe,* it should not be strictly liable in tort for any defects in Abco's wire chopper. In order to reach that result, Equico relies on the distinction between "commercial" lessors and "financial" lessors. The two types of lessors may be defined as follows. A normal, commercial lessor is someone who rents a product to its customer for a relatively short period, with the expectation that the product will be returned at the completion of the term of the lease and, perhaps, then leased to other, future customers. A common example of such a lessor would be the Hertz Corporation, which rents vehicles for short periods. It is now well established that such organizations may be held strictly liable for damages that result if the products

they rent prove to be defective. *See Galluccio v. Hertz Corp.*, 1 Ill.App.3d 272, 274 N.E.2d 178 (5th Dist.1971).

■ A "financial" lessor, on the other hand, does not actually provide the equipment to the lessee, but rather provides the money which allows the user of already selected equipment to purchase it. To a substantial extent, a financial lessor may be analogized to a bank that loans money to its clients. Rather than simply loaning the money for the purchase to the ultimate user of the equipment, the transaction is set up as a "lease," with the lessor "purchasing" the equipment for the specific purpose of "renting" it to the user. Certain tax consequences often provide the incentive for so structuring the transaction. Normally, the lessor has no familiarity with the particular equipment involved, and rarely does the lessor intend to take possession of the equipment when the lease term is completed. Therefore, contemporaneously with entering into the lease agreement, the parties generally execute an option whereby the user can purchase title to the equipment from the lessor at the end of the lease period for an amount less than the then expected value of the equipment. *See Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 372 A.2d 736, 740 n. 3 (1977).

Equico claims that its agreement with Abco is not a true, commercial leasing arrangement, but rather is nothing more than a financial lease. There is certainly no question that that is indeed the case here. Plaintiff itself has alleged, "J.W. Imports and Laursens were informed that the arrangement with Equico was strictly for financing purposes." Amended Complaint, ¶ 17. The copy of the lease, which plaintiff has included in the record, reinforces that conclusion. In the lease, Abco recognizes that it, not Equico, was responsible for selecting the wire chopper. Equico specifically disclaimed all warranties concerning the chopper, and Abco waived all claims it might have against Equico resulting from any defect, malfunction, or the condition of the machine. And, when the lease was signed, Equico and Abco also entered into an option agreement providing that Abco could purchase the wire chopper for $10,000.

Given the particular features of the Abco-Equico lease, and those of financial leases in general, Equico argues that the public policy reasons which support extending strict products liability under Section 402A to commercial lessors do not apply to financial leases. Recognizing that its argument has not been addressed by the Illinois courts, Equico places its primary reliance on the decision of the Supreme Court of Pennsylvania in *Nath v. National Equipment Leasing Corp.*, 497 Pa. 126, 439 A.2d 633 (1981).

The facts of *Nath* are closely analogous to those involved here. Plaintiff Nath was injured while working with an allegedly defective wire and cable stripping machine. Nath's employer, Keystone Metals Co., had acquired the machine from Rigby Manufacturing Co., after bargaining directly with them concerning the machine's purchase price. Keystone asked the *Nath* defendant, National Equipment Leasing Corp. ("National"), to finance the purchase. Rigby Manufacturing then acceded to National's request to re-invoice the machine, showing National as the owner. National leased the machine to Keystone Metals and filed a financing statement on it in accordance with the provisions of the Uniform Commercial Code. After Nath's injury, he sued both Rigby Manufacturing and National.

Following several earlier appeals and a trial, the lower court in *Nath* concluded that the lease between National and Keystone Metals was purely a financing device. Then, relying on the footnote in *Francioni, supra,* the lower court held that strict liability under Section 402A did not apply to financial lessors. Upon appeal, the Pennsylvania Supreme Court agreed.

First, the Pennsylvania Court reviewed the policy considerations behind Section 420A strict liability. The court then concluded that those considerations precluded imposing strict liability on National.

"Section 402A which provides for a form of strict liability is, of course, not predicated upon 'fault' or 'negligence.' That

which provides the basis for fastening liability upon suppliers of products is that the supplier or manufacturer is the one that has the control over the product and places it within the stream of commerce. The party merely financing the transaction has no control over its manufacture, is not involved in the selection of the product nor in any way makes a representation as to its quality or soundness. Between the financier and the ultimate purchaser, it is usually the latter who selects the goods, negotiates for its purchase and has control over its use.

"While it is true that the financing makes the purchase possible, and to that limited extent the financier can be perceived to have participated in the delivery of the product, such a tangential participation in the supplying of the goods does not justify the imposition of strict liability. As noted, the financier is not supplying the chattel but rather is offering the use of money.

.    .    .    .    .

"Financing institutions are not equipped to pass upon the quality of the myriad of products they are called upon to finance nor do they have direct impact upon the manufacturing process of the product to exercise quality control. Finally, their relationship with a particular manufacturer does not, in the normal course, possess the continuity of transactions that would provide a basis for indirect influence over the condition and the safety of the product."

*Nath,* 439 A.2d at 636. *See Cole v. Elliott Equipment Corp.,* 653 F.2d 1031 (5th Cir. 1981). Equico urges this court to accept the analysis in *Nath* as the result that the Illinois courts would reach if they, rather than the federal district court, were faced with this question.

Plaintiff Abco argues to the contrary, claiming the policy considerations behind the products liability law in Illinois are different from those in Pennsylvania, and that when those different considerations are taken into account, this court should find that Illinois would impose strict liability on fi-

nancial lessors. In support of its arguments, Abco relies primarily on three Illinois cases: *Crowe, supra; Dunham v. Vaughn & Bushnell Manufacturing Co.,* 42 Ill.2d 339, 247 N.E.2d 401 (1969); and *Connelly v. Uniroyal, Inc.,* 75 Ill.2d 393, 27 Ill.Dec. 343, 389 N.E.2d 155 (1979).

Each of those cases emphasizes the standard Illinois products liability rule—that liability extends to everyone who "is within the chain of distribution" or who "reaps a profit by placing a product in the stream of commerce." *Crowe,* 74 Ill.2d at 15, 23 Ill. Dec. 80, 383 N.E.2d 951. In *Dunham,* the Illinois court imposed liability on a wholesaler who sold a defective hammer, even though the box in which the hammer was packaged was never opened by the wholesaler. In *Connelly,* the court held the licensor of the trademark appearing on the product would be liable if the product was defective. The court stated,

"A licensor is an integral part of the marketing enterprise, and its participation in the profits, reaped by placing a defective product in the stream of commerce . . ., presents the same public policy reasons for the application of strict liability which supported the imposition of such liability on wholesalers, retailers and lessors."

*Id.,* 75 Ill.2d at 411, 27 Ill.Dec. 343, 389 N.E.2d 155 (citation omitted). The facts in *Connelly,* however, suggest that the defendant Uniroyal had particularly close control over the product, in that it provided "detailed information as to the methods, processes and formulae used in the manufacture of tires and tubes." *Id.* at 407, 27 Ill.Dec. 343, 389 N.E.2d 155.

Abco argues that Equico, as a financial lessor, is like the wholesaler in *Dunham* and the trademark licensor in *Connelly.* Abco suggests that Equico is partially responsible for placing the wire chopper in commerce. Abco has filed an affidavit stating that it would not have purchased the machine if Equico had not been involved in the transaction. Also, Abco argues that Equico will make a substantial profit from this deal. The total of Abco's initial payment to Equi-

co, plus the sixty monthly payments required by the lease, are considerably larger than the purchase price of the wire chopper.

This court, however, is unconvinced by plaintiff Abco's arguments, basically because they ignore the facts and commercial realities of the deal between Abco and Equico. In fact, Equico is not responsible for putting the defective wire chopper into the stream of commerce, as that phrase is used by the Illinois courts. By the time Equico was brought into the deal, Abco had already met with Laursens and J.W. Imports, negotiated the specifications and price of the wire chopper, and agreed to purchase it. As Equico properly notes in its brief in support of this motion, it did not provide the machine but merely provided the money to make the purchase of the machine possible. The court does not believe that Abco could seriously argue that, if it had borrowed money from a bank to pay for the wire chopper, the bank would be liable for any defects. In the instant transaction, Equico occupies essentially the same position as the bank would.

Abco's arguments concerning Equico's profits suffer from similar defects. Viewing Equico's actions properly, it is clear that Equico did not profit "from the defective wire chopper" as Abco contends. Rather, the excess amount received by Equico over and above the purchase price of the wire chopper is nothing more than the interest charged by Equico for the use of its money.

Finally, it is clear that imposing liability on Equico would merely burden financing companies without furthering in any way the traditional justification for strict products liability. As stated in *Crowe,* strict liability is placed on those "in a position to prevent a defective product from entering the stream of commerce," by "either adopt[ing] inspection procedures or influenc[ing] the manufacturer to enhance the safety of a product." *Id.,* 74 Ill.2d at 13–14, 23 Ill.Dec. 80, 383 N.E.2d 951. As a financial lessor, with no expertise in the products involved, and not having been brought into the deal until after the sale was agreed to, Equico had no control whatsoever over the quality of the wire chopper. In sum, this court believes that the Illinois courts would accept the reasoning in *Nath* and find that financial lessors would not be strictly liable for defective products.

In a final effort to salvage its strict liability claim against Equico, Abco argues that its agreement with Equico could be found to be an installment sales contract, rather than a lease. If so, Abco claims that Equico could clearly be held liable under the landmark Illinois case on strict liability, *Suvada v. White Motor Co.,* 32 Ill.2d 612, 210 N.E.2d 182 (1965). However, the court does not believe that the products liability question should depend on how this transaction might be treated for tax or bankruptcy law purposes. Whether the agreement between Equico and Abco is viewed as a "true" lease or as an installment sale, the facts of the financial lease arrangement do not change. It is those facts that compel the conclusion that Count VII of the amended complaint against Equico should be dismissed.

The only remaining count of the amended complaint against Equico is Count IX, which alleges that Equico breached its contract with Abco by failing to provide the consideration called for in the contract—a working wire chopper. Equico has moved to dismiss Count IX as well, arguing that the allegations of plaintiff's complaint demonstrate conclusively that Equico did provide the necessary consideration. The court agrees.

The terms of the lease agreement between Equico and Abco clearly show that Equico was not obligated to provide a nondefective wire chopper in order to comply with the lease. Abco specifically waived all claims that it might have against Equico if the machine were in fact defective, and agreed to the following term in the lease: "No defect of unfitness of the equipment shall relieve lessee of the obligation to pay rent, or any other obligation under this agreement to lessor." Complaint, Exhibit B at 1. Given the financial nature of this lease, as described above, Equico's consideration was not the machine, but rather the money to purchase the machine from Laur-

134

sens and J.W. Imports. Equico has provided the required sum of money, and therefore, has met its obligations under the contract. Other courts which have addressed this question have reached the same conclusion. *See Citicorp Leasing, Inc. v. Allied Institutional Distributors, Inc.,* 454 F.Supp. 511 (W.D.Okla.1977); *Bill Stremmel Motors, Inc. v. IDS Leasing Corp.,* 89 Nev. 414, 514 P.2d 654 (1973); *Transamerica Leasing Corp. v. Van's Realty Co.,* 91 Idaho 510, 427 P.2d 284 (1967); *Funding Systems Leasing Corp. v. King Louie International, Inc.,* 597 S.W.2d 624 (Mo.App.1979).

V. *Conclusion.*

For the reasons stated above, defendant Laursens' motion to dismiss is denied. Defendant J.W. Imports' motion to dismiss Counts VII and VIII of the amended complaint is denied. Laursens and J.W. Imports are ordered to answer or otherwise plead within 20 days after the entry of this order. Defendant Equico's motion to dismiss is granted, and Equico is ordered dismissed from this suit.