JOHN SMITH *v.* MRS. MARY RODGERS, ADMX

5-5757                                                    477 S.W. 2d 831

Opinion delivered February 14, 1972
[Rehearing denied March 20, 1972.]

*C. E. Yingling, Jr.* and *Wright, Lindsey & Jennings;*
By: *William R. Overton,* for appellant.

*Lightle, Tedder & Hannah,* for appellee.

CONLEY BYRD, Justice. John A. R. Rodgers was killed
May 3, 1968, at the Reynolds & Williams Hog Thief cut-
off bridge construction site on Highway No. 305 when
the boom cable on a ten ton Bucyrus Erie crane broke
while lifting 2,400 pounds of concrete. His widow, ap-
pellee Mrs. Mary Rodgers as administratrix, brought this
action for damages against appellant John Smith as
owner of the crane and as Reynolds & Williams' super-
intendent of structure work. The matter was submitted
to the jury upon an instruction that if they found that
Smith owned the crane and had general supervision
over it, he then owed a duty to see that the crane was
maintained in safe operating condition. The jury re-
turned verdicts totalling $63,891.41 upon which judg-
ment was entered. For reversal Smith contends, among

other things, that as an employee of Reynolds & Williams and as owner of the crane he owed no individual duty to John A. R. Rodgers to maintain the machine in a safe condition and that at the time of the injury he was not a third-party tortfeasor within the meaning of the Arkansas Workmen's Compensation Law.

Workmen's compensation is being paid to the widow through Firemen's Fund Ins. Co., Reynold & Williams' compensation carrier.

The record shows that John Smith is in the bridge contracting business. His office is located at Reynolds & Williams' place of business. He owns eight cranes which he stores in Reynolds & Williams' equipment yard. He does some bridge construction on his own. In those instances he uses his own payroll and equipment. He also enters into arrangements on a job to job basis with Reynolds & Williams to bid on highway contracts. All such arrangements are oral and have been for the last 20 years.

On the job involved, the proof was that Smith and James H. Reynolds of Reynolds & Williams went over the highway specifications to see if they were interested in the job. The structural bridge specifications were segregated from the dirt work. Smith then estimated the labor, material, equipment, workmen's compensation and hospitalization insurance, etc., that made up the total cost of the structure work. Reynolds and Smith then agreed on the profit that Smith added for himself. Reynolds then added Smith's total estimate to the other items involved in the highway specifications and their agreed profit and submitted a total bid to the State Highway Department. In such arrangements it was orally understood that Smith would supervise the construction of the structure work but that the job would be considered a Reynolds & Williams job. Under this arrangement Smith was paid a salary or draw of $100 per week and all employees were carried on Reynolds' payroll. All costs of materials and equipment rentals, maintenance and repair were also paid by Reynolds & Williams.

Smith was expected to use his equipment and also Reynolds' equipment whenever necessary. Such equipment cost had been estimated on the basis of replacement costs and was charged to the books on that basis.

After a job was completed and payment received, Reynolds & Williams, from the portion allocable to the structure work, deducted all costs paid by them plus their prearranged profit percentage and anything left was paid over to Smith.

Smith in his supervisory capacity had the authority to hire and fire employees and to sign payroll checks on Reynolds' bank account. On the job in question, Smith hired the job foreman, Horace Mathis. Mathis hired everybody else who worked on the job. Smith's supervision consisted of conferring with Mathis on the work to be done between Smith's visits to the job. Such work was ordinarily laid out for a week to ten days ahead. Smith's directions to Mathis were that the crane was to be inspected and greased after every 50 hours of operation. The day to day inspection was to be done by the crane operator and any repair or maintenance which the operator could not perform was to be done by mechanics supplied by Mathis. Reynolds did not expect Smith to personally make day to day inspections of equipment. The crane was moved to the job in August of 1967.

Ralph Whittaker, the operator of the Bucyrus Erie Model 11B crane, had had the boom down before the accident to place a 20 ft. jib extension on the boom. At that time he completely unwound the cable. As an operator with 12 or 13 years experience, he testified that in his opinion the cable did not need replacing at that time. However, the cable broke within a short time thereafter while lifting a load of only 2,400 pounds. When first contacted by appellee's counsel, he told them that he was working for John Smith. At the trial it developed that he was hired by Mathis and paid by Reynolds payroll checks.

Allan Siegel with Industrial Testing Laboratories of St. Louis, Missouri, had made tests on the broken cable

and concluded that it broke from excessive corrosion and erosion.

On examination of Smith by his counsel the following occurred:

"Q. Are you a partner. in Reynolds and Williams Company, a formal partner?

A. No, Sir."

On examination of Smith by Appellee's counsel the following occurred:

"Q. Mr. Smith, if I have undestood your testimony given in reply to Mr. Overton's questions, it is your contention that although you were at the time of this accident an employee of Williams and Reynolds—

A. Reynolds and Williams.

Q. —you were not a subcontractor, were you?

A. No, sir.

Q. Now then, in fact had you been a subcontractor you would have had to show that in the contract with the Highway Department, wouldn't you?

A. Yes, sir."

James H. Reynolds testified that the arrangement with Smith was not for the furnishing of equipment. That they used Smith for his skill and for his bidding ability to get projects. If Smith could come up with a good figure on the concrete work to help them get a job, they wanted him there. According to Reynolds the

initial responsibility for the crane's maintenance was that of the operator. If the operator did not fulfill his responsibility, then it was the foreman's duty. If the foreman didn't fulfill his duty, then it would fall upon the next supervisor in line until it finally fell on him. In other words they used a chain of command in trying to keep down accidents.

A Travelers Insurance Company policy showing workmen's compensation insurance coverage to Smith in his individual capacity was tendered in evidence but excluded by the trial court as irrelevant.

We agree with appellant that the trial court should have directed a verdict in his favor. He and Reynolds had an agreement with reference to their joint undertaking including a division of profits and the carrying of workmen's compensation and hospitalization insurance. Smith exercised control through his supervision and Reynolds through control of the purse and the employees. The fact that Smith did not sign the Highway Department contract would not relieve him of liability, *Wenzel Machinery Rental & Sales Co.* v. *Adkins*, 189 Kan. 435, 370 P. 2d 141 (1962). Thus under the uncontradicted evidence, Smith was nothing more nor less than a joint venturer and as such is exonerated from tort liability as an employer by the Workmen's Compensation Law, *Neal* v. *Oliver*, 246 Ark. 377, 438 S. W. 2d 313 (1969).

Even if Smith be considered as something other than an employer, it does not follow that appellee is entitled to recover. As an intermediate supervisor he would be liable only for his personal negligence and not for the negligence of those whom he supervised. As the bailor of the crane, he cannot be held liable under the theories set forth in Restatement of Torts § 392 for there is no evidence to show that at the time of the bailment, nine months prior to the accident, the crane was not safe for the use for which it was supplied or that Smith failed to exercise reasonable care to discover its dangerous condition or character.

Appellee in seeking to charge Smith with the condition of the crane at a date subsequent to the bailment,

seeks to do so on the theory that knowledge of the crane operator and the foreman as to the condition of the cable caused by excessive corrosion and erosion should be imputed to Smith. In this approach appellee is met with the fact that Smith's relationship to the decedent is no different from his relationship to the crane operator. Since imputed knowledge is applicable only to an employer, appellee in attempting to charge Smith with such vicarious responsibility is again met with the employer's exoneration in the Workmen's Compensation Law.

Reversed and dismissed.