735 F.2d 1073
 Carol Rae WRIGHT; Bonnie Lynn Wright; the Estate of Tina
Marie Wright, deceased, by her Personal
Representative, Patricia Wright, Appellants,
v.
Daniel Paul NEWMAN; John Scheall, American Auto Shippers,
Inc., a New York Corporation; Phil Long Ford, Inc., a
Colorado Corporation; General Motors Acceptance
Corporation, a New York Corporation; and Ford Motor Credit
Company, a Delaware Corporation, Appellees.
 No. 83-1401.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 16, 1983.
Decided June 5, 1984.
 
 Thomas Strong, Mathew W. Placzek, Rebecca B. Myers, Strong, Placzek & Wooddell, P.C., Springfield, Mo., for appellants.
 Griffin Smith, Smith & Nixon, Little Rock, Ark., for appellees.
 Before HEANEY, Circuit Judge; HENLEY, Senior Circuit Judge; and COLLINSON, Senior District Judge.*
 HEANEY, Circuit Judge.
 
 
 1
 Carol Rae Wright, Bonnie Lynn Wright, and Patricia Wright, as personal representative of the estate of Tina Marie Wright, appeal the district court's[1] grant of summary judgment in favor of appellee Ford Motor Credit Company (FMCC). The Wrights maintain that genuine issues of material fact exist as to FMCC's liability under the tort theories of strict liability and negligence. Because we believe the facts alleged do not, as a matter of law, relieve FMCC of possible liability for negligence, we reverse the grant of summary judgment and remand to the district court for further proceedings.
 
 BACKGROUND
 
 2
 The Wrights' cause of action arises out of a fatal car accident that occurred in Missouri. On March 4, 1980, Bonnie, Lynn, and Tina Wright were driving from their parents' home in Joplin, Missouri, to the University of Arkansas in Fayetteville, Arkansas. They were traveling southbound on Highway 71, near Anderson, Missouri. At the same time, Daniel Paul Newman was driving a 1978 Ford pickup northbound on Highway 71 and was towing a 1977 Pontiac Firebird. Newman was heading downhill and negotiating a righthand curve when he heard a chain drop. Looking in the rear view mirror, he saw that the car he had been towing had broken loose and was traveling into the opposite lane of traffic. The car collided head-on with the Wrights' automobile.
 
 
 3
 Tina Wright was killed instantly. Carol Rae Wright suffered a serious skull fracture which damaged her hypothalamus and which necessitated surgical removal of a part of her brain. Due to the accident, her IQ has decreased, her personality has changed, and the right side of her face is deformed. Bonnie Wright sustained a broken arm and numerous cuts on her face.
 
 
 4
 At the time of the accident, Newman was employed by John Scheall as a driver for Scheall Driveaway Company. FMCC had contracted with Scheall to transport the Ford pickup from Fayetteville to Phil Long Ford, Inc., in Denver, Colorado. FMCC had purchased the finance contract on the pickup from Phil Long Ford. When the purchaser of the pickup defaulted on the sales contract, FMCC had the responsibility, pursuant to the dealer purchase agreement, to repossess the pickup and transport it back to Phil Long Ford for resale. The accident occurred while the pickup was in transit back to the dealer.
 
 
 5
 The Firebird had been repossessed by General Motors Acceptance Corporation and was being transported by Scheall to Arizona under an agreement similar to that between Scheall and FMCC. Newman had picked up the Firebird in Fort Smith, and had driven it to Fayetteville where he took charge of the pickup. He attached the Firebird to the pickup towing ball.
 
 
 6
 The Wrights instituted a diversity action on April 29, 1981, in the United States District Court for the Western District of Arkansas. In their amended complaint, the Wrights named as defendants Newman; his employer, Scheall Driveaway; its principal, American Auto Shippers, Inc.; the company that had repossessed the Pontiac Firebird, General Motor Acceptance Corporation; Phil Long Ford, Inc.; and FMCC. On May 13, 1982, the district court granted summary judgment in favor of the latter three companies. Wright v. Newman, 539 F.Supp. 1331 (W.D.Ark.1982).
 
 
 7
 On September 21, 1982, the case was transferred to the United States District Court for the Western District of Missouri. The court tried the case against the remaining defendants on February 10 and 11, 1983. On February 17, 1983, the court entered judgment for Carol Wright in the amount of $5 million, for Bonnie Wright in the amount of $250,000, and for the estate of Tina Wright in the amount of $525,000, for a total damage award of $5,775,000. Apparently only $300,000, the collision limits of Scheall Driveaway's insurance coverage, has been collected to date.
 
 
 8
 The Wrights appeal the grant of summary judgment in favor of FMCC. They contend that summary judgment was improper because the facts alleged raise the issue of FMCC's liability under the strict liability doctrine. They allege that a defective towing ball attached to the repossessed Ford pickup caused the accident, and that FMCC should be on the same footing as a manufacturer or retail seller that places a defective product on the market. The Wrights further argue that FMCC is liable under a negligence theory because it furnished Scheall Driveaway with an unsafe vehicle. We reject the former theory but find a remand to be necessary on the latter.
 
 DISCUSSION
 
 9
 In order to resolve the state law issues before us, we must first determine which state law applies. In granting summary judgment, the district court sitting in Arkansas determined that Arkansas courts would apply the law of Colorado, the state where the finance contract was made. The district court viewed FMCC's possible liability as predicated solely on the doctrine of respondeat superior. It therefore applied the conflict of law rule applicable to contract cases, reasoning that the nature of the contractual relationship between FMCC and Scheall Driveaway was the crucial issue for resolution. The court then ruled that the most significant contacts between Scheall and FMCC took place in Colorado and applied the law of that state.[2]
 
 
 10
 The issues urged before us on appeal do not hinge on the contractual relationship between FMCC and Scheall Driveaway, but rather on the possibly negligent acts or omissions of FMCC and on whether its position in the Ford pickup's chain of distribution warrants the imposition of strict liability. Arkansas does not appear to have developed specific principles governing the choice of law in strict or product liability cases. See French v. Grove Manufacturing Co., 656 F.2d 295, 297 (8th Cir.1981); Parker v. Seaboard Coastline R.R., 573 F.2d 1004, 1010 (8th Cir.1978) (applying Arkansas strict liability statute against corporate defendants where accident occurred in Arkansas). We therefore look to the factors determining the choice of law in tort cases generally.
 
 
 11
 The parties agree that either Arkansas or Missouri law applies in this case. Missouri was the situs of the accident and under Arkansas' old rule, Missouri's law would control by virtue of that fact alone. McGinty v. Ballentine Produce, Inc., 241 Ark. 533, 408 S.W.2d 891, 893 (1966). Arkansas has adopted a more flexible approach in recent years, however, which requires attention to the following "choice-influencing" considerations: (1) predictability of results, (2) maintenance of interstate and international order, (3) simplification of the judicial task, (4) advancement of the forum government's interests, and (5) application of the better rule of law. Wallis v. Mrs. Smith's Pie Co., 261 Ark. 622, 550 S.W.2d 453, 456 (1977) (en banc). This more flexible approach makes the application of Arkansas law a viable alternative in this case because the three young women injured in the accident were citizens of Arkansas at the time, and the negligent act or omission which may have caused the accident could have occurred in Arkansas.
 
 
 12
 The factor analysis seems to lead back to the old rule, however, in a case like this where the substantive law is not appreciably different in the optional jurisdictions. If the substantive law governing the issues raised is substantially the same in Arkansas and Missouri, Arkansas' governmental interests are not advanced by application of its own law; and neither is there an interest in applying a better rule of law. On the other hand, predictability of results and simplification of the judicial task are served by simply applying the law of the state where the accident occurred--Missouri. We thus conclude the Arkansas courts would apply the law of Missouri in resolving the issues, although this conclusion is primarily grounded on the perception that the result would be no different under Arkansas law.
 
 
 13
 A. Strict Liability.
 
 
 14
 As a threshold matter, FMCC opposes our consideration of the strict liability issue on the ground that it was not raised before the district court. In their amended complaint, the Wrights alleged the negligent acts of the driver of the pickup truck were imputed to his "employers and principals," including FMCC. In addition, the Wrights alleged FMCC was "guilty of negligence and willful and wanton conduct in disregard of the rights and safety of others" in (1) allowing the pickup and defective towing ball to be operated when FMCC knew or should have known of the unsafe condition, (2) failing to inspect the towing equipment and pickup for defects, (3) failing to provide Newman with proper towing instructions and equipment, and (4) negligently entrusting the pickup to Newman. Nowhere in their complaint do the Wrights explicitly advance a theory of strict liability, and the district court did not discuss strict liability in granting FMCC summary judgment.
 
 
 15
 As a general rule, we do not consider arguments or theories on appeal that were not advanced in the proceedings below. Korgel v. United States, 619 F.2d 16, 18 (8th Cir.1980); Kapp v. Naturelle, Inc., 611 F.2d 703, 709 (8th Cir.1979). This rule has less appeal, however, in a case such as this one in which the issue can be resolved as a matter of law and the pertinent record has been fully developed. See United States v. Dann, 706 F.2d 919, 925 n. 5 (9th Cir.1983); Sgro v. United States, 609 F.2d 1259, 1264 n. 8 (7th Cir.1979). Moreover, the allegations raised in the complaint appear broad enough to have notified FMCC of the specific issue. See Oglala Sioux Tribe of Indians v. Andrus, 603 F.2d 707, 714 (8th Cir.1979). We thus exercise our discretion in favor of reaching the strict liability issue, and resolve it in favor of FMCC.
 
 
 16
 Missouri has adopted the substantive law on strict liability set forth in Section 402A, Restatement (Second) of Torts (1965). McGowne v. Challenge-Cook Bros., Inc., 672 F.2d 652, 660 (8th Cir.1982); Keener v. Dayton Electric Manufacturing Co., 445 S.W.2d 362, 364 (Mo.1969). Section 402A imposes strict liability on commercial sellers of defective goods which are unreasonably dangerous to users, consumers, and their property.[3] Missouri, like most states, has extended the class of commercial distributors liable under 402A beyond sellers and manufacturers to commercial lessors and bailors. Vanskike v. AFC Industries, Inc., 665 F.2d 188, 198 (8th Cir.1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); Gabbard v. Stephenson's Orchard, Inc., 565 S.W.2d 753, 757 (Mo.App.1978); see also Crowe v. Public Bldg. Comm'n of Chicago, 74 Ill.2d 10, 23 Ill.Dec. 80, 383 N.E.2d 951, 954 (1978); Rourke v. Garza, 530 S.W.2d 794, 800 (Tex.1976); Perfection Paint & Color Co. v. Konduris, 147 Ind.App. 106, 258 N.E.2d 681, 688 (1970). The Wrights argue that FMCC, the lending institution responsible for financing the allegedly defective Ford pickup, should be liable under this extension of 402A.
 
 
 17
 In extending the doctrine of strict liability, the courts have been guided by the reasons underlying the creation of the doctrine. Strict liability for sellers is premised upon the belief that as between the consuming public and those responsible for placing a defective product on the market, the latter should bear the burden of any attendant losses. The seller is in a position through inspection and pressure on the manufacturer to control the flow of dangerous products into the market. The seller is also generally better able to bear and distribute the costs resulting from injury due to a defective product. At base is the perception that the best way to protect consumers from defective goods is to make those who reap a profit from their distribution pay for any harm caused. See Restatement (Second) of Torts Sec. 402A, comment c (1965).
 
 
 18
 Missouri courts, among others, have noted that the same policy considerations that justify imposition of strict liability upon sellers apply to commercial lessors and bailors. Gabbard v. Stephenson's Orchard, Inc., supra, 565 S.W.2d at 758; Katz v. Slade, 460 S.W.2d 608, 612 (Mo.1970). In Gabbard, an orchard owner was held strictly liable for injuries resulting when it furnished a defective ladder to a customer. Quoting from an Indiana case, the court noted:
 
 
 19
 "The accomplishment of the Restatement's stated objectives and the protection which flows therefrom is not dependent upon a 'sale.' ... To limit the rule to only those situations in which there has been an actual sale would be to circumscribe the rule to such an extent that its purpose might be defeated. ... The label ..., gratuitous furnishing, is not of great significance; the nature of the transaction serves as the basis of strict liability in tort and not the name by which it is called. In protecting the consumer, the rule of strict liability in tort attaches to products which are placed in the stream of commerce."Gabbard v. Stephenson's Orchard, Inc., supra, 565 S.W.2d at 758 (quoting Perfection Paint & Color Co. v. Konduris, supra, 258 N.E.2d at 686-688).
 
 
 20
 FMCC is not a distributor of a product in any sense.[4] It is in the business of financing the purchase of Ford Motor Company products from authorized dealers. As a financial institution, FMCC is in a different relationship to the product and to the consumer than are the commercial entities responsible for distribution. In Nath v. National Equipment Leasing Corp., 497 Pa. 126, 439 A.2d 633 (1981), the Pennsylvania Supreme Court considered whether financial lessors, i.e., companies which retain leases on equipment purely as a financing device, should be subject to strict liability when the equipment proves defective. Based on the policy considerations underlying 402A, the court concluded strict liability was inapplicable.
 
 
 21
 Section 402A which provides for a form of strict liability is, of course, not predicated upon "fault" or "negligence." That which provides the basis for fastening liability upon suppliers of products is that the supplier or manufacturer is the one that has the control over the product and places it within the stream of commerce. The party merely financing the transaction has no control over its manufacture, is not involved in the selection of the product nor in any way makes a representation as to its quality or soundness. Between the financier and the ultimate purchaser, it is usually the latter who selects the goods, negotiates for its purchase and has control over its use.
 
 
 22
 While it is true that the financing makes the purchase possible, and to that limited extent the financier can be perceived to have participated in the delivery of the product, such a tangential participation in the supplying of the goods does not justify the imposition of strict liability. As noted, the financier is not supplying the chattel but rather is offering the use of money.
 
 
 23
 * * * Financing institutions are not equipped to pass upon the quality of the myriad of products they are called upon to finance nor do they have direct impact upon the manufacturing process of the product to exercise quality control. Finally, their relationship with a particular manufacturer does not, in the normal course, possess the continuity of transactions that would provide a basis for indirect influence over the condition and the safety of the product.
 
 
 24
 Id. at 636; see Cole v. Elliott Equipment Corp., 653 F.2d 1031, 1034 (5th Cir.1981); ABCO Metal Corp. v. J.W. Imports Co., 560 F.Supp. 125, 132 (N.D.Ill.1982), aff'd, 721 F.2d 583 (7th Cir.1983).
 
 
 25
 The Wrights rely on broad language in Missouri cases and elsewhere to argue that FMCC should be subject to strict liability simply because it is "an integral part of the overall marketplace" and it handled the Ford pickup as part of its "profit making operation." See Vanskike v. AFC Industries, supra, 665 F.2d at 198; Gabbard v. Stephenson's Orchard, Inc., supra, 565 S.W.2d at 758. Attention to the facts of these and other cases which discuss the outer reaches of the strict liability doctrine reveals, however, that profit on a transaction and participation in the market is not enough. "What is crucial to the rule of strict liability is not the means of marketing, but rather the fact of marketing whether by sale, lease or bailment, for use and consumption by the public." Francioni v. Gibsonia Truck Corp., 372 Pa. 362, 372 A.2d 736, 738 (1977). The focus is thus on whether the commercial entity is in the chain of distribution that provides a product to the consumer. Finance companies have the merely tangential function of providing money to make the purchase of a product possible. See ABCO Metal Corp. v. Equico Lessors, Inc., 721 F.2d 583, 586 (7th Cir.1983) (applying Illinois law).
 
 
 26
 We therefore conclude that in the circumstances of this case a Missouri court would not hold FMCC strictly liable.[5] Missouri and other states recognizing the doctrine of strict liability have confined the reach of that doctrine to distributors either by sale, lease, or bailment. FMCC does not fit that category.[6]
 
 
 27
 B. Negligence.
 
 
 28
 In granting FMCC's motion for summary judgment, the district court found, first, that Newman--the driver of the repossessed pickup--was not an agent or employee of FMCC; and, second, that FMCC's prior uneventful association with Scheall Driveaway negated a finding of negligent entrustment. However, appellants make another argument not discussed by the district court. The appellants argue that FMCC had a duty to inspect the vehicle before delivery to Scheall because FMCC supplied the pickup used as a towing vehicle to Scheall for business purposes. Appellants contend that FMCC would have discovered the defective towing ball if it had carefully inspected the towing ball before allowing Scheall to drive the pickup to Colorado.[7]
 
 
 29
 Appellants rely on section 392 of Restatement (Second) of Torts (1965), which provides:
 
 
 30
 One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied
 
 
 31
 (a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or
 
 
 32
 (b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it.
 
 
 33
 Section 392(b) clearly imposes two duties upon one who supplies chattels for a business purpose: (1) a duty to inspect for a defect, and (2) the duty to inform anyone expected to use it of defects found, if any. Lynden Transport, Inc. v. Haragan, 623 P.2d 789, 798 (Alaska 1981).
 
 
 34
 The Missouri Supreme Court has cited Sec. 392 with approval on more than one occasion. E.g., Fletcher v. Kemp, 327 S.W.2d 178, 185 (Mo.1959); Winkler v. Macon Gas Co., 361 Mo. 1017, 238 S.W.2d 386, 391-92 (1951).[8] We thus agree with appellants that Sec. 392 is a fair statement of Missouri law.[9]
 
 
 35
 The question thus becomes whether Missouri courts would, as a matter of law, decline to apply section 392 in the situation here. Section 392 has several requirements, all of which must be fulfilled before liability can be imposed. In the context of this case, appellants must show at trial that (1) FMCC is a supplier; (2) the pickup was supplied to Scheall for FMCC's business purposes; (3) the pickup was used in the manner for which and by persons for whose use it was supplied; (4) the towing mechanism was defective, the defect was discoverable on inspection, and the defect caused the accident; and (5) FMCC failed to inspect the towing mechanism and failed to inform Scheall of the defect. Because the district court resolved this case on FMCC's summary judgment motion, the burden was on FMCC to establish the absence of disputed material facts relevant to these requirements. E.g., McLain v. Meier, 612 F.2d 349, 355 (8th Cir.1979).[10]
 
 
 36
 The first issue is whether Missouri courts would consider FMCC a supplier within the meaning of section 392.[11] Comment c to this section states that actual ownership of the chattel is immaterial, as long as the supplier has possession or control of the item for his or her business purposes. In this case, it is undisputed that FMCC repossessed the pickup and undertook to cause it to be returned to Colorado. A plainer showing of possession and control is hard to imagine.
 
 
 37
 The next question is whether FMCC supplied the truck to Scheall for a business purpose. Comment f makes it clear that the section does not distinguish between different types of business purposes. Rather, liability will attach when the chattel is supplied "in furtherance of any business purpose." The critical fact is whether FMCC "derived either directly or indirectly, some form of pecuniary gain in its own business through the use of the chattel." Lambert v. Pittsburgh Bridge and Iron Works, 227 Pa.Super. 50, 323 A.2d 107, 112 (1974), aff'd, 463 Pa. 237, 344 A.2d 810 (1975).
 
 
 38
 As a general proposition, shipping its repossessed vehicles through Scheall Driveaway furthers FMCC's business purpose of making good on its finance contracts. If FMCC can return the vehicle to the dealer within the time period specified in the contract, the dealer pays off FMCC's remaining interest in the contract. Scheall Driveaway usually transports vehicles in one of two ways. People can walk into a Scheall Driveaway office and ask if there is a vehicle going to a certain destination. In exchange for free use of the vehicle, the individual drives it to the shipper's desired destination. For this type of "casual" move, the driver need only produce a regular driver's license and a small damage deposit. Scheall also employs professional drivers--people with chauffeurs' licenses. Thus, where individual drivers transport FMCC's vehicles through Scheall, FMCC would clearly be a supplier for business purposes under section 392.
 
 
 39
 In this case, we have the added circumstance that Scheall was using FMCC's pickup to tow another vehicle. Taking the Wrights' version of the facts as true, Scheall's towing practice was the actual cause of the accident. The question thus becomes whether it was part of FMCC's business purpose for Scheall to use the pickup to tow the Firebird. See comment d to section 392. If FMCC allowed Scheall to use its vehicles to tow other vehicles purely as an accommodation or convenience to Scheall, then the towing would not be a use for FMCC's business purpose. Dulin v. Circle F Industries, Inc., 558 F.2d 456, 465-466 (8th Cir.1977) (applying Arkansas law); comment d to section 392. If, however, Scheall's towing practice was mutually advantageous to both FMCC and Scheall, FMCC could be held liable for injuries stemming from the practice. See Kennedy v. United States Construction Co., 545 F.2d 81, 84 (8th Cir.1976) (applying Arkansas law). Thus, to meet this element of their section 392 claim, the Wrights must show FMCC derived some substantial benefit or advantage from Scheall's towing practice.
 
 
 40
 The third requirement under section 392 is that the truck was used "in the manner for which and by persons for whose use the [truck was] supplied." The general issues here are whether FMCC knew Scheall used repossessed vehicles to tow other repossessed vehicles and whether FMCC consented to this activity. If FMCC had no knowledge of Scheall's towing practices, then it would have no reason to inspect towing mechanisms. The specific question here is whether FMCC should have known the pickup would or could be used as a towing vehicle. The record is undeveloped on this issue.[12]
 
 
 41
 Fourth, it must be shown that the towing ball was defective, the defect was discoverable on reasonable inspection, and the defect caused the accident. There is some evidence in the record that the towing ball was defective and that the defect caused the accident. We can find little in the record to indicate whether the defect was discoverable on reasonable inspection.
 
 
 42
 Finally, appellants must prove that FMCC failed to use reasonable care to inspect the towing ball and failed to inform Scheall of any defects. There is some evidence in the record indicating FMCC may have believed it had delegated this duty to Scheall or to the repossession company. However, Scheall's bill of lading places the duty to inspect for defects on the shipper--FMCC.[13] Whatever the facts are found to be in this regard, on remand they should be evaluated, to the extent evaluation becomes necessary, in light of Restatement section 393, which makes the duty to inspect nondelegable.[14] Under section 393, if a third party makes a reasonable inspection, then the section 392 supplier would not be liable. If, on the other hand, a negligent inspection were made, or none at all, the section 392 supplier could not avoid liability by claiming it delegated this duty.
 
 
 43
 The factual disputes, of course, are to be resolved by the district court. Occhino v. United States, 686 F.2d 1302, 1311-12 (8th Cir.1982); Backus v. Panhandle Eastern Pipe Line Co., 558 F.2d 1373, 1376 (10th Cir.1977).
 
 CONCLUSION
 
 44
 We conclude that as a matter of Missouri law, FMCC would not be held strictly liable for any injuries caused by defects on vehicles it finances. We further conclude, however, that FMCC is a supplier within the meaning of section 392, and as such, Missouri courts would hold it liable for negligence if the other elements of a section 392 cause of action are proven. We therefore vacate the grant of summary judgment and remand to the district court for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable William R. Collinson, Senior District Judge for the Eastern and Western Districts of Missouri, sitting by designation
 
 
 [1]
 The Honorable H. Franklin Waters, United States District Court Judge for the Western District of Arkansas
 
 
 [2]
 According to the district court, its resolution of this issue would have been the same even if it had applied Arkansas law
 
 
 [3]
 Restatement (Second) of Torts (1965) Sec. 402A provides:
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
 
 
 [4]
 The record does not support the Wrights' contention that FMCC was in the business of selling vehicles simply because it oversees the repossession of vehicles and their transportation back to the dealer for resale
 
 
 [5]
 FMCC argues that it cannot be subjected to strict liability because, under the provisions of the Uniform Commercial Code, it was not the owner of the pickup truck at the time the accident occurred. See U.C.C. Sec. 9-504(4) & (5). We disagree that the issue turns on this point. Retailers and manufacturers may be strictly liable for injuries caused by defective products after the title transfers to the consumer. Obviously, ownership or title possession are not prerequisites to liability under this doctrine
 
 
 [6]
 The fact that FMCC had repossessed the car at the time of the accident does not change its position outside the chain of distribution for strict liability purposes. See Nath v. National Equipment Leasing Corp., 497 Pa. 126, 439 A.2d 633, 636 (1981). It is a crucial fact, however, in considering its possible liability under a negligence theory. See infra
 
 
 [7]
 The plaintiffs did plead that FMCC negligently failed to inspect the towing ball. We consider that the issue was thereby raised before the district court, and that FMCC was put on notice of the claim. See Oglala Sioux Tribe of Indians v. Andrus, 603 F.2d 707, 714 (8th Cir. 1979). Thus, even though the district court did not explicitly decide the issue, it is not a case in which the appellants are making a totally new argument, and we may review the question. See Roofing & Sheet Metal Service v. LaQuinta Motor Inns, 689 F.2d 982, 990 (11th Cir.1982)
 
 
 [8]
 These cases cited the First Restatement version of Sec. 392, but it is virtually identical to that of the Restatement 2d
 
 
 [9]
 The law in Arkansas is less clear on whether Sec. 392 would be adopted, but it has been cited with apparent approval in Smith v. Rodgers, 251 Ark. 994, 477 S.W.2d 831, 834 (1972). In that case, the court held that a bailor could not be held liable under Sec. 392 because there was no evidence to show that the chattel was not safe for the use for which it was supplied, or that the bailor failed to exercise reasonable care to discover the dangerous condition. Id. See Dulin v. Circle F Industries, 558 F.2d 456, 466 (8th Cir.1977); Kennedy v. U.S. Const. Co., 545 F.2d 81, 84 (8th Cir.1976)
 
 
 [10]
 Even though plaintiffs pleaded negligent failure to inspect, FMCC's motion for summary judgment did not mention the issue. Neither did the plaintiffs in their response, nor the district court when it granted FMCC's motion. It is only on appeal that plaintiffs have clearly outlined their theory of negligence under section 392 and that FMCC has attacked that theory. The result is that very few facts were developed or established below on the issues pertinent to a section 392 case
 
 
 [11]
 There would appear to be a distinction between suppliers within the judicially extended meaning of section 402A and suppliers within the meaning of section 392. Suppliers in the original distribution chain are held strictly liable under section 402A for injuries caused by any defects, discoverable or not, which are ultimately traceable to the manufacturer. As explained previously, strict liability is predicated upon the distributors' links to the manufacturer. The supplier's liability under section 392, on the other hand, is based upon the failure to make a reasonable inspection and warn of any discoverable defects. Lynden Transport, Inc. v. Haragan, 623 P.2d 789, 798 (Alaska 1981). The class of defendants subject to liability under section 392 is larger than the class of defendants subject to strict liability, and includes the strict liability defendants, as well as contractors and shippers. W. Prosser, Law of Torts Sec. 104, at 676 (4th ed 1971). The scope of liability is narrower, however, because liability attaches only when the dangerous condition was discoverable when the instrumentality was transferred
 
 
 [12]
 The record indicates that FMCC requested a casual driver rate. Although casual drivers are not allowed to tow vehicles, there is some indication that when professional drivers were used in a towing arrangement, Scheall charged the lower casual rate
 
 
 [13]
 The Bill of Lading states in relevant part:
 Shipper authorizes carrier and the driver to operate shipper's vehicle. * * * Shipper warrants that the vehicle is in good mechanical and operating condition, that the vehicle has been fully serviced * * * and that the vehicle is roadworthy and ready for shipment. Shipper further warrants that he knows of no structural or mechanical defects which would limit the safe operation of this vehicle. Carrier disclaims any liability for structural or mechanical defects, mechanical breakdowns or any losses or damages arising therefrom.
 Because Newman, Scheall's driver, signed as the agent of the shipper on the face of the bill of lading, the identities of the parties to this contract are somewhat difficult to determine. Reading the entire contract as a whole, however, it appears FMCC is the shipper and Scheall Driveaway is the carrier.
 
 
 [14]
 Sec. 393. Effect of Third Person's Duty to Inspect
 One who supplies through a third person a chattel to be used for the supplier's business purposes is subject to liability under the rules stated in Secs. 391 and 392 although the dangerous character or condition of the chattel is discoverable by an inspection which the third person is under a duty to the person injured to make.