Lorena Harriet RIDENHOUR,
Plaintiff-Respondent,

v.

COLSON CASTER
CORPORATION, Defendant,

and

M.C. Rippeto Company, Inc.,
Defendant-Appellant.

No. 13453.

Missouri Court of Appeals,
Southern District,
Division One.

March 14, 1985.

Motion for Rehearing or to Transfer
Denied on April 2, 1985.

Application to Transfer Denied
April 30, 1985.

Erwin L. Milne, Stockard, Andereck, Hauck, Sharp and Evans, Jefferson City, for defendant-appellant.

Dan L. Birdsong, Thomas, Birdsong, Clayton & Haslag, P.C., Rolla, for plaintiff-respondent.

FLANIGAN, Judge.

Plaintiff Lorena Ridenhour brought this action for the wrongful death of her husband Lester Ridenhour, who died on December 23, 1980, as a result of injuries which he sustained the preceding day when he fell from a scaffold owned by defendant M. C. Rippeto Company, Inc., ("Rippeto"). Decedent, an iron worker, was employed by McCarthy Brothers Construction Company, the general contractor for the construction of an addition to the Phelps County Memorial Hospital at Rolla. Rippeto was a plastering subcontractor for McCarthy Brothers.

The second defendant was Colson Caster Corporation, ("Colson"). Plaintiff claimed that Colson had manufactured the casters attached to the legs of the scaffold. The jury found the issues in favor of plaintiff and against Rippeto and awarded plaintiff $150,000. The jury denied plaintiff recovery on her claim against Colson. Only Rippeto appeals.

Rippeto contends that portions of Instruction 7, plaintiff's verdict-director against Rippeto, were not supported by the evidence and that, by reason of these evidentiary deficiencies, plaintiff failed to make a submissible case against Rippeto. Instruction 7 reads:

"INSTRUCTION NO. 7

Your verdict must be for plaintiff on her claim against M.C. Rippeto Company, Inc. if you believe:

First, defendant M.C. Rippeto Company, Inc. furnished a scaffold which had a caster on it to plaintiff's husband, Lester Ridenhour, for use, and

Second, the caster had been improperly welded and was therefore dangerous when put to a use reasonably anticipated, and

Third, the caster was used in a manner reasonably anticipated, and

Fourth, plaintiff's husband, Lester Ridenhour, did not know and by using ordinary care could not have known of such dangerous condition, and

Fifth, defendant M.C. Rippeto Company, Inc. knew or by using ordinary care could have known of such dangerous condition, and

Sixth, defendant M.C. Rippeto Company, Inc. failed to warn plaintiff's husband, Lester Ridenhour, of such dangerous condition, and

Seventh, defendant M.C. Rippeto Company, Inc. was thereby negligent, and

Eighth, as a direct result of such negligence plaintiff's husband, Lester Ridenhour, died

unless you believe plaintiff is not entitled to recover by reason of Instruction No. 8."

Instruction 8, given at the request of Rippeto, submitted, as a defense, contributory negligence on the part of Lester Ridenhour.

Rippeto contends that there was no showing that Rippeto derived any commercial benefit from Ridenhour's use of the scaffold; that his use of the scaffold was the product of a "gratuitous bailment"; that the bailor in a gratuitous bailment is not liable to the bailee for injuries arising out of a defect in the bailed article unless the bailor had *actual knowledge* of the defect and failed to warn the bailee of it.

Accordingly, argues Rippeto, paragraph Fifth of Instruction 7 is erroneous in not confining its requirement to actual knowledge on the part of Rippeto of the dangerous condition, that is, the improper weld in the caster. Constructive knowledge of that defect, Rippeto argues, is insufficient to impose liability on Rippeto and paragraph Fifth improperly hypothesized constructive knowledge as a sufficient alternate finding. Rippeto further argues that even if the bailment of the scaffold was a mutual benefit bailment, imposing upon the bailor a duty to use ordinary care to inspect the scaffold for defects, the defect here was one which would not have been disclosed by such an inspection.

Attached to the bottom of each of the four legs of the scaffold was a "rolling caster." Plaintiff's evidence showed that the scaffold, while being used in the ordinary manner by Ridenhour and a co-worker, "tilted and fell" causing Ridenhour to "fall over backwards, striking his head on the concrete." Plaintiff's evidence also showed that the tilting of the scaffold was caused by a defect in one of the casters. The defect consisted of an improper weld.

The leg of the scaffold is bolted into a "box" which is a component of the caster. The box was welded to a lower component of the caster, which contained the wheel. The defective weld between the box and the lower component "was covered—you could not see it when it was intact," according to plaintiff's witness Leon Henderson.

Plaintiff's witness Robert Wolf, an expert in mechanical and metallurgical engineering, testified that the tilting of the scaffold was due to a "metal failure" when the defective caster separated from its top and broke. According to Wolf, the welded surface, which was circular, should have been welded for the entire circle but only "10 to 20 percent" of the circle was welded.

Wolf testified that in his opinion the weld "was part of the manufacturing process," but he also stated that it was possible that the defective welding took place some time later when the caster was repaired and that "it was the repair that failed." Wolf testified that the welded area would not be open to the view of workmen. "You would have to take the caster off [of the leg of the scaffold] and look down to see the weld. You would have to take the caster apart and you would have to have some expertise, more than the ordinary workman, to see that there was a defect."

Plaintiff's evidence failed to show specifically when the defective welding took place or the identity of the welder. Instruction 7 did not require a finding that Rippeto did the defective welding.

Immediately following the accident McCarthy Brothers took possession of the scaffold, including the casters. Plaintiff's expert Wolf was permitted to inspect and photograph that equipment. The accident was investigated by the Occupational Safety and Health Administration, ("OSHA"). After that investigation was completed, the scaffold, including the defective caster, was returned to Rippeto. While in Rippeto's possession, the defective caster was lost.

Plaintiff's witness Fred Seitz, a Colson employee, looked at photographs of the defective caster. His testimony was that the broken caster was not a Colson caster because Colson "has never welded a box to the top of a swivel type caster." On Colson casters "the box is held to the top of the caster by a rivet." Plaintiff's witness Bill Green, an employee of Rippeto, testified that the scaffold was new when purchased by Rippeto and, as far as he knew, Rippeto had not welded the box to the lower portion of the caster.

Plaintiff's witness Charles Ousley, a foreman for Rippeto, testified that Ridenhour asked to borrow the scaffold and Ousley gave permission. Ousley also testified, "It is common to borrow equipment between contractors and subcontractors. It prevents having too much equipment on the job." Plaintiff also introduced evidence that McCarthy Brothers "loaned Rippeto our welders, cutting torches and ladders. It saved having two sets of equipment on the job."

The contract between McCarthy Brothers and Rippeto required Rippeto to furnish the necessary equipment for the performance of Rippeto's work but did not require Rippeto to furnish equipment for the employees of McCarthy Brothers.

Evidence introduced by defendant Colson showed that Colson did not manufacture casters "with a weld on it in this particular area," and that if the defective caster was a Colson caster, the defective welding took place "after it left the Colson manufacturing plant—some time after it left Colson."

The briefs of the parties cite no Missouri case involving the liability of a subcontractor to an employee of the general contractor for injuries sustained by the employee arising out of a defect in a piece of equipment bailed to him by the subcontractor under the circumstances present here.

There is substantial out-state authority for the proposition that a subcontractor whose equipment is used gratuitously by an employee of another contractor or subcontractor on the same project is not, as a general rule, liable for injuries sustained by the user as a result of the defective condition of the equipment where the subcontractor lacked actual knowledge of the defective condition, because the user in such a case is a mere licensee or gratuitous bailee. *Arthur v. Standard Engineering Co.*, 193 F.2d 903 (D.C. Cir.1951); *Hill v. Lyons Plumbing & Heating Co.*, 457 S.W.2d 503 (Ky.1970); *Brauner v. Leutz*, 293 Ky. 406, 169 S.W.2d 4 (1943); *Eddy v. John J. Brady Plastering Co.*, 111 Ohio App. 190, 171 N.E.2d 722 (1959); *Olivier v. Snowden*, 426 S.W.2d 545 (Tex.1968); 13 Am.Jur.2d Building & Construction Contracts § 137, p. 128; 32 A.L.R.2d 414 (Duty and liability of subcontractor to employee of another contractor using equipment and apparatus of former). In *Correa v. Stephens*, 429 P.2d 254 (Alaska 1967), the defendant, a general contractor, was held not liable to plaintiff, himself a subcontractor, for injuries caused by a defect in the ladder plaintiff borrowed from defendant who had no actual knowledge of the defect.

In *Arthur, Hill, Brauner, Eddy*, and *Olivier*, the defendants, as owners of the borrowed and defective equipment, were absolved of liability where they lacked actual knowledge of the defect, although a custom existed for contractors and subcontractors and their respective employees to borrow equipment from each other. *Arthur, Brauner, Eddy*, and *Olivier* were defective scaffold cases. In *Correa* and *Hill* a ladder was the borrowed defective equipment.

The rationale of the foregoing cases is consistent with the following rule, expressed in 8 Am.Jur.2d Bailments § 162, p. 894:

"Where a bailment is purely gratuitous, and created for the exclusive benefit of the bailee, as where articles are loaned to another simply for his own use, without any reward or compensation being received from him by the lender, the bailor's only duty with respect to defects is to inform the bailee of any of which he is aware and which might make the use of the subject of the loan perilous to the bailee or his servants. The ground of this obligation is that when a person lends he ought to confer a benefit, not do a mischief. But the obligation of a mere lender goes no further than this, and he cannot therefore be made liable for not communicating anything he did not in fact know, whether he ought to have known it or not." See, also, 8 C.J.S. Bailments § 25b, p. 386.

In *Arthur v. Standard Engineering Co.*, supra, a leading case, plaintiff, an employee of a subcontractor, sustained injury as a result of a defect in a scaffold owned by defendant, another subcontractor. There was evidence that it had long been the custom for a scaffold constructed by one subcontractor to be used by the employees of other subcontractors. There was also evidence that defendant used ladders owned by the subcontractor which employed plaintiff.

The court pointed out that a difference exists between the duty owed by an invitor to an invitee with respect to defective appliances furnished the latter and the duty

owed by a licensor to a licensee with respect to defective appliances furnished the latter. The invitor owes the invitee the duty of furnishing him with a reasonably safe appliance and is liable for injuries caused by the negligent failure to perform that duty. On the other hand a licensor is not liable for the injuries of a mere licensee caused by a defective appliance furnished by the licensor unless the licensor was guilty of active negligence which caused the injury. *Arthur v. Standard Engineering Co.*, supra, at p. 905.

The court then addressed the issue of whether the plaintiff, in using the borrowed scaffold, was a licensee or an invitee. The court pointed out that the Court of Appeals of New York, in *Quigley v. Thatcher*, 207 N.Y. 66, 100 N.E. 596 (1912), invoked the so-called "reasonable convenience" rule and held that a general contractor was liable to the employee of a subcontractor injured by a defective scaffold which a general contractor had erected. The scaffold was so constructed and located that the subcontractor "must of necessity or under the requirements of reasonable convenience in the performance of his work use the same," *Arthur v. Standard Engineering Co.*, supra, at p. 905. The New York court held the general contractor should have anticipated such use and was under a duty to use reasonable care to construct it so it would be safe for those who would naturally and customarily use it in the course of the work. In *McGlone v. Angus*, 248 N.Y. 197, 161 N.E. 469 (1928), under similar circumstances, a subcontractor was held liable to an employee of another subcontractor for injuries caused by a defect in a scaffold erected by the former.

The court, in *Arthur v. Standard Engineering Co.*, supra, said that neither of the New York opinions had considered the question of the legal status of the subcontractor's injured workman—whether he was a licensee or an invitee. Rejecting the New York approach, the court adopted "the mutual benefit test" for determining whether the injured workman was a licensee or an invitee. The court said that although Arthur had been given permission to use the scaffold, that fact alone established no higher relation than that of mere licensor and licensee. The court quoted the following language from *Bennett v. Louisville & N. Railroad Co.*, 12 Otto 577, 584–585, 102 U.S. 577, 584–585, 26 L.Ed. 235 (1880): "The principle * * * appears to be that invitation is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using it."

The court then discussed the significance of the general custom for "scaffolds, ladders, and such, which were built or provided by one subcontractor, to be utilized by employees of other subcontractors." The existence of that custom did not make Arthur an invitee. At p. 907 the court said:

"The existence of such a custom simply permits consent to the use to be implied in instances where consent was not expressly given. . . .

"There was no evidence tending to show that the Standard Engineering Company had any interest in, or derived any benefit or advantage from, the work done by Arthur and the other Foley employees as they stood on the scaffold. So, under the mutual benefit test, Arthur was not an invitee. It was proved, however, that the steamfitters had used the electricians' ladders, from which it is argued that Standard Engineering gave the use of the scaffold as a quid pro quo for its use of the ladders, and in that fashion derived benefit from Arthur's presence on the plank.

"The argument pushes the mutual benefit theory too far, we think. Reciprocal use of different pieces of equipment simply shows the custom in operation. From it, consent by each subcontractor to the use of its equipment by other subcontractors may be implied, just as it may be implied from proof of the custom alone in cases where

there was no actual reciprocal use or no express consent.

"The true test under the mutual advantage theory is whether the owner of a scaffold or other appliance receives benefit or advantage from the permitted use by another of that particular piece of equipment. If so, the user is an invitee; if not, he is a licensee." Plaintiff was denied recovery.

A case factually similar to the case at bar is *Olivier v. Snowden,* supra, where plaintiff Snowden, an employee of the general contractor, was injured when using a defective scaffold owned by defendant Olivier, a subcontractor. Snowden claimed that his legal status was that of invitee because of the existence of a custom "allowing mutual use of scaffolding." That custom, argued Snowden, imposed upon the defendant a duty to furnish all employees, including the employees of the general contractor, a safe place to work. The Texas court rejected that argument and approved the holding in *Arthur v. Standard Engineering Co.,* supra. Citing the Restatement of Torts, Second, including § 392,[1] the court said the Restatement "classifies such a situation as we have here as being comparable to a loan of chattels." The court said, at p. 550:

"The law is well settled that, ordinarily, one is not liable for injuries resulting from the defective condition of a chattel loaned to another, where the one loaning the chattel did not in fact know of the defective condition, whether he ought to have known it or not, and such one is under no duty to examine the condition of the chattel before lending it."

.    .    .    .    .

1. "§ 392.  Chattel Dangerous for Intended Use
   One who supplies to another, directly or through a third person, a chattel *to be used for the supplier's business purposes* is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied

"The comment under Section 392 of the Restatement also makes it clear that before liability of a person who supplies a chattel can attach, under these circumstances, there must be evidence showing that the use of the chattel is one in which the supplier has a business interest."

.    .    .    .    .

"Furthermore, the facts here do not meet the true test under the mutual advantage theory. We cannot agree with the theory that the *mutual use* of scaffolds as described here inured to the benefit of Olivier merely because such use of scaffolds would result in saving the extra cost of tearing down another contractor's scaffold and erecting one in its place. Reciprocal use of different pieces of equipment owned by different contractors simply shows the custom in operation. Prosser on Torts (3rd Ed.) at page 396, says: 'The "business" on which the visitor comes must be one of at least potential pecuniary profit to the possessor.'" (Emphasis in original)

The court found no evidence that the work which Snowden was performing resulted in any pecuniary benefit to Olivier.

In *Olivier,* a dissenting judge, in whose opinion three other judges joined, stated that the various contractors benefited from the reciprocal use of each other's scaffolds by saving the time and expense of erecting their own scaffolds when an existing scaffold would serve the purpose. The dissenters stated that there was evidence that the defendant acquiesced in the custom of sharing a scaffold for business reasons to his own indirect advantage, and not merely to accommodate or benefit the plaintiff. It was the view of the dissenting judges that

   (a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or
   (b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it." (Emphasis added)

when it is shown that it is the custom of workmen of different crafts or employers to use the scaffolds of the other, the scaffolds should be constructed in a reasonably safe manner for all workers who might reasonably be foreseen as using them in an ordinary manner.

Section 392 of the Restatement of Torts, Second, set forth in footnote 1, imposes liability, under given circumstances, upon a supplier of a chattel "to be used for the supplier's business purposes." Comment e under § 392 reads:

"e. *Supplying tools for workmen.* One who employs another to erect a structure or to do other work, and *agrees* for that purpose to supply the necessary tools and temporary structures, supplies them to the employees of such other for a business purpose. This is true irrespective of whether the structure or work when finished is to be used for business or residential and social purposes. *On the other hand,* if it is understood that the person who is to do the work is to supply his own instrumentalities, but the person for whom the work is to be done *permits* his own tools or appliances to be used as a favor to the person doing the work, the tools and appliances are supplied as a gratuity and not for use for the supplier's business purposes." (Emphasis added)

■ Under the foregoing authorities it was incumbent upon plaintiff, in seeking to impose liability on Rippeto, to prove that Rippeto had actual, and not merely constructive, knowledge of the defect in the caster and failed to give a proper warning.

In *Clark v. Granby Mining & Smelting Co.,* 183 S.W. 1099, 1101 (Mo.App.1916), a case not factually in point, the court set forth, in language substantially similar to that expressed in 8 Am.Jur.2d Bailments § 162, p. 894, quoted supra, the rules governing the liability of a gratuitous bailor to a bailee injured by reason of a defect in the article bailed. The court then said:

"Where, however, the bailment is for the mutual benefit of both bailor and bailee, the former's obligation is correspondingly enlarged; and it is therefore his duty to deliver the thing hired in a proper condition to be used as contemplated by the parties. For a failure to do so, he is justly held liable for the damage directly resulting to the bailee from its unsafe condition. This distinction is fundamental and seems to be generally recognized."

There is a paucity, or perhaps non-existence, of Missouri cases, other than automobile cases, dealing with injuries to a bailee arising out of a defect in a gratuitously bailed article. Perhaps that is due to the fact that the legal requirement confronting the bailee to adduce proof of the bailor's actual knowledge of the defect is rarely met.

In mutual benefit bailment situations the bailor has been held liable, on a negligence theory, to the bailee where the defect in the bailed article was created by the bailor. *Gilpin v. Pitman,* 577 S.W.2d 72 (Mo.App. 1978). In *Gabbard v. Stephenson's Orchard, Inc.,* 565 S.W.2d 753 (Mo.App.1978), the bailor of a defective ladder was held liable, on the theory of strict liability, to the injured bailee, where the bailor derived economic benefit from the bailment. The court equated the liability of a mutual benefit bailor with that of a lessor and quoted with favor language from a California case to this effect: "It makes good sense to impose on the lessors of chattels the same liability for physical harm which has been imposed on the manufacturers and retailers."

In *Katz v. Slade,* 460 S.W.2d 608 (Mo. 1970), the court, referring to the doctrine of strict liability in tort, said at p. 611: "It has never been applied in this State to situations involving mutual benefit bailments, leases or rentals of the products of industry." The holding in *Katz* was that a bystander could not recover under the doctrine of strict liability in tort from a municipal corporation which was the owner-lessor of a golf cart for injuries sustained when struck while the cart was being operated by a third party-lessee as a result of a defect rendering the vehicle unfit for its intended use.

In *Whitney v. Central Paper Stock Co.*, 446 S.W.2d 415 (Mo.App.1969), a defendant, who had furnished a trailer to the employer of the injured plaintiff for the economic benefit of defendant, was held to have the duty "to furnish a trailer which was reasonably safe for the intended use by [plaintiff's employer's] employees." The defendant, said the court, at p. 418, "was required to exercise ordinary care to determine whether the trailer was in fact safe at the time of its delivery to the employer's premises, and if not to either repair it or warn of the danger."

At least with respect to the gratuitous bailment of an automobile, there is Missouri authority for the proposition that evidence of bailor's actual knowledge of a defect in the automobile is not necessary if there is a showing of constructive knowledge, coupled with proof of other elements of the cause of action. In *Vogelgesang v. Waelder*, 238 S.W.2d 849 (Mo.App.1951), the court said, at p. 855:

"The following facts must be proven in order to fix this type of liability upon the owner of an automobile: (1) the ownership of the car; (2) the gratuitous bailment; (3) the existence of the defective condition at the time of the bailment; (4) knowledge by the owner *at that time* of the existence of the defective condition. See *Bolin v. Corliss Co.*, 262 Mass. 115, 159 N.E. 612 (1928). This may be actual or constructive knowledge. If constructive knowledge is relied upon there must be proof either that the defect had existed for such a length of time that the owner in the exercise of ordinary diligence could or should have known of it, or that the defect was of such a nature that it would have been revealed by an ordinary inspection, and that such inspection was not made. (5) The connection between the defective condition and the injury or damage (proximate cause)." (Emphasis in original) But see *Wright v. Newman*, 735 F.2d 1073 (8th Cir.1984), discussed infra.

In *Vogelgesang* the plaintiff failed to prove requirements (3) and (4) and thus made no submissible case against the bailor.

As Ridenhour's employer, McCarthy Brothers had a non-delegable duty to provide him with reasonably safe equipment, *Blankenship v. St. Joseph Fuel Oil & Mfg. Co.*, 360 Mo. 1171, 232 S.W.2d 954, 959 (1950); *Wright v. Kansas City Structural Steel Co.*, 236 Mo.App. 872, 157 S.W.2d 582, 590 (1941), and there is Missouri authority to the effect that even if the scaffold had been rented by Rippeto to McCarthy Brothers, no master-servant relationship existed between Rippeto and Ridenhour. *Blankenship v. St. Joseph Fuel Oil & Mfg. Co.*, supra, 232 S.W.2d at 957; *Komeshak v. Missouri Petroleum Products Co.*, 314 S.W.2d 263, 268 (Mo.App. 1958).

Although Missouri has a statute dealing with scaffolds, § 292.090 RSMo 1978, it has been held that a plaintiff may not claim the benefit of the violation of that statute or a companion statute in the same 1891 act where no employee-employer relationship existed between plaintiff and defendant. *Glaser v. Rothschild*, 221 Mo. 180, 120 S.W. 1 (1909); *Behre v. Hemp & Co.*, 191 S.W. 1038 (Mo.App.1917).

In *Wright v. Newman*, 735 F.2d 1073 (8th Cir.1984), a case based on Missouri law, the court said that § 392 of the Restatement, Second, of Torts, quoted in footnote 1, "is a fair statement of Missouri law." The case involved the liability of Ford Motor Credit Co., (FMCC), for injuries allegedly due to a defective towing mechanism on a pickup truck supplied, that is bailed, by FMCC to one Scheall.

At p. 1080 the court said:

"Section 392 has several requirements, all of which must be fulfilled before liability can be imposed. In the context of this case, appellants must show at trial that (1) FMCC is a supplier; (2) the pickup was supplied to Scheall for FMCC's business purposes; (3) the pickup was used in the manner for which and by persons for whose use it was supplied; (4) the towing mechanism was defective, the defect was discoverable on inspection, and the defect caused the accident; and (5) FMCC failed

to inspect the towing mechanism and failed to inform Scheall of the defect."

The court also referred to § 402A of the Restatement, Second, of Torts, which imposes strict liability on commercial sellers of defective goods which are unreasonably dangerous to users, consumers, and their property. Citing *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362, 364 (Mo.1969), the court said that Missouri had adopted the substantive law on strict liability set forth in § 402A. The court also cited *Gabbard v. Stephenson's Orchard, Inc.*, supra, and said that Missouri "has extended the class of commercial distributors liable under 402A beyond sellers and manufacturers to commercial lessors and bailors." *Wright v. Newman*, supra, at p. 1077.

Discussing the relationship between §§ 392 and 402A the court said, at p. 1080:

"There would appear to be a distinction between suppliers within the judicially extended meaning of section 402A and suppliers within the meaning of section 392. Suppliers in the original distribution chain are held strictly liable under section 402A for ‛injuries caused by any defects, discoverable or not, which are ultimately traceable to the manufacturer. As explained previously, strict liability is predicated upon the distributors' links to the manufacturer. The supplier's liability under section 392, on the other hand, is based upon the failure to make a reasonable inspection and warn of any discoverable defects. *Lynden Transport, Inc. v. Haragan*, 623 P.2d 789, 798 (Alaska 1981). The class of defendants subject to liability under section 392 is larger than the class of defendants subject to strict liability, and includes the strict liability defendants, as well as contractors and shippers. W. Prosser, Law of Torts § 104, at 676 (4th Ed. 1971). The scope of liability is narrower, however, because liability attaches only when the dangerous condition was discoverable when the instrumentality was transferred."

Alluding to the requirement of § 392 that the chattel be supplied to the bailee for the business purposes of the bailor, the court said, at p. 1080: "The critical fact is whether FMCC 'derived either directly or indirectly, some form of pecuniary gain in its own business through the use of the chattel.' "

■■■ This court adopts the rationale of *Arthur v. Standard Engineering Co.*, supra, and the other out-state authorities cited above which are consistent with that decision. A contrary holding, making it the duty of a subcontractor at least to conduct a reasonable inspection of his equipment before permitting it to be borrowed by employees of other contractors or subcontractors, might undermine a custom of mutual lending. This court holds that Rippeto's scaffold was not supplied to Ridenhour for Rippeto's "business purposes," § 392 of the Restatement, Second, of Torts, *Wright v. Newman*, supra, and that the bailment of the scaffold was gratuitous. It follows that paragraph Fifth of Instruction 7 was reversibly erroneous in not limiting the requirement of that paragraph to actual knowledge, on the part of Rippeto, of the defect. It is, therefore, unnecessary to determine whether the instruction is otherwise erroneous or whether there is soundness in Rippeto's alternate argument that the defect was not of the type discloseable by reasonable inspection even if there was a mutual benefit bailment here.

Since the plaintiff may have simply mistaken her legal theory and since, on retrial, it is possible, particularly in light of the Colson evidence, that plaintiff might be able to prove Rippeto's actual knowledge of the defect, this court exercises its discretion to reverse and remand rather than to reverse outright. *Morris v. Shell Oil Company*, 467 S.W.2d 39, 43 (Mo.1971); *Katz v. Slade*, supra, at p. 614; *Whitney v. Central Paper Stock Co.*, supra, at p. 420.

The judgment is reversed and the cause remanded for further proceedings consistent herewith.

TITUS, P.J., and GREENE, J., concur.